## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LINDA HENNING,

        Petitioner,

v.                                                                    No. CIV 08-328 RB/LFG

ALLEN COOPER, Warden, and the
ATTORNEY GENERAL OF THE
STATE OF NEW MEXICO,

        Respondents.

### MAGISTRATE JUDGE'S FINDINGS
### AND RECOMMENDED DISPOSITION[1]

### Findings

    1.      On March 26, 2008, Petitioner Linda Henning ("Henning") filed a petition for writ

of habeas corpus under 28 U.S.C. § 2254.  [Doc. 1.]  Henning currently is confined at the New

Mexico Women's Correctional Facility[2] in Grants, New Mexico and proceeds *pro se*.

---

[1]**Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.**

[2]Respondent should correct Petitioner's address in its records to reflect New Mexico Women's Correctional Facility rather than Western New Mexico Correctional Facility, both of which are located in Grants, New Mexico. [*See* Doc. 12, Answer, Certificate of Service.]

2.     Henning filed an addendum to her federal habeas petition on May 8, 2008. [Doc. 6.] On August 7, 2008, Respondents filed an Answer and a separate motion to dismiss and accompanying memorandum, arguing that Henning did not exhaust all of the claims raised in her § 2254 petition. [Doc. Nos. 12, 13, 14.]  On August 25, 2008, Henning responded to the motion to dismiss, and on September 9, 2008, she filed an second addendum to the § 2254 petition. [Doc. Nos. 15, 16.]

3.     On February 13, 2009, the undersigned Chief Magistrate Judge Lorenzo F. Garcia recommended that Respondent's motion to dismiss, based on Henning's failure to exhaust certain claims, be granted in part and denied in part. [Doc. 18, Report and Recommendation.] On March 3, 2009, Henning filed objections. [Doc. 20.] On March 20, 2009, after consideration of Henning's objections, the Honorable District Court Judge Robert C. Brack entered an Order amending the Magistrate Judge's Report and Recommendation, in part, and adopting it. [Doc. 21.] The result was that some of Henning's many claims were allowed to proceed and others were dismissed for failure to exhaust. [Doc. 21, pp. 23-24.] Henning's motion to reconsider the order adopting the amended Report and Recommendation was denied.  [Doc. Nos. 23 and 24.]

4.     The Magistrate Judge required that Respondents file the record proper and transcripts. They were submitted on April 2, 2009.[3] [Doc. Nos. 22, 25.] As part of its review of Henning's § 2254 petition, the Court considered her original motion [Doc. 1], the May 8, 2008 addendum [Doc. 6], the September 9, 2008 second addendum, extensive exhibits submitted with her pleadings [Doc.

_____

[3]On April 17, 2009, the Magistrate Judge wrote to Petitioner and Respondents inquiring into the status of one volume of the transcript, dated October 30, 2002, which Respondents stated was "not included" and "was not available" according to the court reporter. [Doc. 25, p. 3.] Respondents submitted a Notice, dated April 23, 2009, indicating, through the court reporter, that no hearings were held in the underlying criminal case on October 30, 2002.  Thus, the date was erroneously designated as a hearing date and no transcript ever existed for that date. [Doc. 26.]

2

16], and Respondents' Answer, with exhibits [Doc. 12]. Exhibits included Henning's direct appeal, state habeas petition, and petition for writ of certiorari, along with voluminous attachments. The Court also reviewed two volumes of the record proper and several pleadings in one sealed envelope in cause number CR-99-03647 (initial indictment), three volumes of the record proper in cause number CR-2001-2063 (second indictment), and about thirty volumes of transcripts, including transcripts of the July 27, 2001 arraignment, July 1, 2001 hearing on counsel's motion to withdraw, August 12, 2002 hearing on pretrial motions, August 13, 2002 <u>Ogden</u> hearing,[4] jury selection and trial for September 23, 24, 25, 26, 2002, and October 1, 2, 3, 4, 7, 8, 9, 10, 11, 15, 16, 17, 18, 22, 23, and 25, 2002,[5] October 29, 2002 death penalty-qualified proceeding, October 31, 2002 hearing on post-trial motion, November 22, 2002 hearing on motion for judgment of acquittal, April 16, 2003 evidentiary hearing, and April 18, 2003 sentencing proceeding.[6]

     5.     As grounds for federal review, Henning brings four broad claims, broken down into sections and numerous subclaims: (1) denial of due process and a fair trial based on the state trial court's abuse of discretion; (2) ineffective assistance of trial counsel; (3) denial of due process and a fair trial based on prosecutorial misconduct; and (4) insufficiency of the evidence. [Doc. Nos. 1, 6, 16.]

---

[4]In <u>State v. Ogden</u>, 118 N.M. 234, 238-40 (1994), *cert. denied*, 513 U.S. 936 (1994), the New Mexico Supreme Court endorsed a pretrial evaluation of aggravating circumstances by the trial court upon a defendant's motion to dismiss aggravating circumstances. Thus, during the pretrial <u>Ogden</u> hearing, a trial court determines if there is probable cause that aggravating circumstances exist for purposes of proceeding with a death penalty case. [Tr.#4, p. 213.]

[5]The Court was not provided with grand jury transcripts, trial exhibits, most state court motion hearing transcripts, or transcripts of tapes that were read into evidence at trial.

[6]Although several state district court judges were involved during different phases of the criminal proceeding, State Court Judge W. John Brennan of the Second Judicial District Court in Bernalillo County conducted all of the trial proceedings, including *voir dire*, the <u>Ogden</u> hearing, the trial, the death penalty-qualified proceeding, hearings on post-trial motions and the sentencing proceeding.

3

6.     The Court first considered whether there was a need for an evidentiary hearing under 28 U.S.C. § 2254(e), and whether additional briefing from the parties on any of the issues would be of assistance, but  determined that neither was necessary.  After a thorough review of the pertinent law, pleadings, exhibits, and transcripts of the underlying criminal proceeding, the Court recommends denying Henning's § 2254 petition and dismissing the remaining claims, with prejudice.

<u>Overview</u>

7.     The underlying criminal proceeding involved the disappearance of Girly Chew Hossencofft ("Girly Chew" or "Girly") on September 9, 1999, and her unfortunate death.  She was last seen on September 9th at a little after 5 p.m., at an Albuquerque, New Mexico Bank of America, where she worked as a teller.   She worked at Bank of America since 1997 and was considered an exceptional and efficient employee. [Tr#9, p. 61, 90, Oct. 1, 2002 trial.][7] She was estranged from her husband, Diazien Hossencofft ("Diazien").  She was very friendly and well-liked. [<u>Id.</u>, pp. 61, 78.]   Girly was a "permanent resident" in the United States and a citizen of Malaysia, where her family still lives. [Tr.#18, p. 6, Oct. 15, 2002 trial.] She lived and worked in Albuquerque since 1992. [Tr.#11, p. 189, Oct. 3, 2002 trial.]  In September 1999, Girly was 36 years old.  [Tr.#18, p. 12.] She was petite, five feet tall and weighed about 95 pounds. [Tr.#14, Oct. 8, 2002 trial, p, 86; Tr.#12, p. 70, Oct. 4, 2002 trial.]

8.     Girly returned to her apartment after working on September 9, 1999.  However, her friends could not reach her later that evening or the following morning, and she did not show up to work on September 10, 1999.  When Girly failed to appear at work police were contacted, and a

---

[7]References to "Tr.#" are to the state court trial transcripts unless otherwise noted.  References to "RP" are to the state court record proper.  References to "Doc." are to pleadings in the federal habeas proceeding.

lengthy investigation ensued.  Girly Chew's body was never located, nor was it determined how she was killed.  However, a significant amount of circumstantial and DNA evidence implicated Diazien, Henning, and Bill Miller ("Miller"), a friend of Henning's, in Girly's disappearance and murder. (*See "Evidence Presented" below.*)

9.      Diazien, Girly's husband, eventually pled guilty to the murder and admitted to master-minding both her kidnapping and murder.  The plot involved other people as well.  As a result of his conviction, Diazien is serving a 90-year sentence.  A grand jury did not indict Miller on the more serious charges and ultimately indicted him only on minor tampering with evidence charges.  In 2003, he pled no contest to three counts of tampering with evidence and was given a suspended sentence.[8]  Henning's case went to trial, and a jury convicted her of felony murder and other charges.  She is serving a life sentence.

## Procedural Summary

### *First Indictment of Henning (CR 99-03647)* (two volumes of Record Proper)[9]

#### *1999*

10.      On September 10, 1999, when Girly Chew did not show up for work, the investigation focused on Diazien.  Henning was not a subject of the investigation although she was interviewed by police regarding Diazien's location and Girly's disappearance.

11.      A grand jury convened in September, October and November 1999.  On about 9/22/99, Henning testified at the grand jury. [RP 113, 215.] She claimed she had never met Girly

---

[8]The Court takes judicial notice of its pleadings filed in a federal civil rights lawsuit – Miller v. Spiers, et al., No. CIV 05-577 BB/LAM, Memorandum Opinion and Order, pp. 6-7 [Doc. 176] (D.N.M.  Apr. 13, 2007). *See* St. Louis Baptist Temple, Inc. v. FDIC, 605 F.2d 1169, 1172 (10th Cir. 1979) (court make take judicial notice of its own records and that of official state court proceedings).

[9]References to the RP in this section are to the record proper in CR 99-03647, the first indictment.

and never been in her apartment.  She also testified that Diazien had never taken any blood from Henning. [Tr.#4, p. 120, Aug. 13, 2002 Ogden hearing.]  Judge Albert Murdoch was the presiding grand jury judge. [RP 250.]

12.     On October 19, 1999, target letters went out to Henning and Diazien, informing them that they both were considered as suspects in the capital murder of Girly Chew. [RP 113.]

13.     On October 20, 1999, Miller testified at a grand jury, stating that the only remark Diazien made to Miller about a gun was that he wanted a high-powered rifle so Diazien could shoot Girly from a distance. [Tr.#4, p. 59.] Miller also testified that Diazien stated he wanted Miller and Henning "to get rid of this woman [Girly]."  "I want you to – you and Linda to grab Girly and bring her to me." [Id.]

14.     On October 29, 1999, Henning was arrested from a hotel in Albuquerque where she was staying. [RP 84.]

15.     On November 18, 1999, a grand jury in Bernalillo County indicted Henning with first degree murder or in the alternative, first degree felony murder, conspiracy to commit first degree murder, first degree kidnapping, conspiracy to commit kidnapping, four counts of perjury, two counts of criminal solicitation to commit perjury, five counts of tampering with evidence, and five counts of conspiracy to commit tampering with evidence in the murder of Girly (20 counts). [RP 1.] The State filed a notice of intent to seek the death penalty, alleging aggravating circumstances that Henning allegedly committed the murder during the commission of or attempt to commit kidnapping.  [RP 37.]

16.     Henning's bond was set by Judge Murdoch at $2,500,000, cash only. [RP 10.]

17.     On November 18, 1999, Henning was arraigned and pled not guilty.  She was represented by attorney Darryl Cordle. [RP 13.]

6

*2000*

18.     On January 3, 2000, Henning's attorney filed a motion to dismiss, or in the alternative, motion to compel full disclosure and discovery.  Henning specifically requested scientific studies, reports and other discovery she had not received. [RP 30.]

19.     On March 3, 2000, Henning's attorney, Cordle, moved to withdraw based on Henning's inability to pay for private counsel, expert witnesses, and forensic work needed for her case.  The State Public Defender was to substitute. [RP 39.] Judge Richard Knowles granted the motion, and Trienah Meyers Gorman entered an appearance on April 7, 2000.[10] [RP 41, 46.]

20.     April 7, 2000, Gorman filed a comprehensive set of pretrial motions, and a motion hearing was set for May 16, 2000. [RP 49-80.]

21.     A number of stipulated petitions were filed in this case asking for additional time within which to try the case.  Some were filed by Henning; some by the State.  Neither party opposed the motions, and they were all granted. [*See, e.g.,* RP 83, 97, 167, 174.] Indeed, on April 7, 2006, Gorman filed a motion to expand time within which to disclose witnesses and evidence, stating that it "takes an enormous amount of time to be able to accomplish things such as investigation; finding, locating, and interviewing witnesses in a capital case."  Gorman argued that to attempt to properly investigate a death penalty case within 180 days was not possible and would amount to ineffective assistance of counsel. [RP 69.]

---

[10]Henning claims she had about ten attorneys during her criminal proceeding.  She further alleges that Cordle embezzled over $30,000 from her and that due to potential criminal drug charges against him, he left New Mexico and gave up his license to practice law.  [Doc. 1.] Henning asserts Gorman had to give up her license to practice law because she misappropriated $25,000 from the State Trial Lawyer's Fund and that she was also attending Narcotics Anonymous when she represented Henning.  [Doc. 1.]  Henning argues that another of her attorneys, Edward Bustamante, failed to attend hearings in this case, either alone or with Henning.  [Doc. 1.] Finally, Henning asserts, in part, that her trial attorney, Gary Mitchell, "rushed the case to trial with no more than a 'four leaf clover' and his 'lucky rabbit's foot.'"  [Doc. 1, Doc. 9, Ex. J, p.49.]

22.     The State issued a number of notices to take statements of potential witnesses during this time frame, including a notice to take Miller's statement regarding a taped conversation between Miller and Henning on or between 9/22/99 and 10/20/99 at the law office of Tim Padilla. [RP 108.]

23.     On July 3, 2000, the State filed a motion to show cause as to Miller's non-appearance and non-production of an audio tape.  There was evidence that Miller had returned a telephonic "page" from Henning after her 9/22/99 grand jury testimony and that Miller had been in the office of his attorney Tim Padilla where his call to Henning was taped. [RP 113.]

24.     On July 12, 2000, Miller filed a response to the motion to show cause, stating that Miller never possessed the audio tape that was sought and that Tim Padilla had misplaced the tape during the relocation of his law office.  At this time, the tape had not been located. [RP 129.]

25.     On July 17, 2000, Judge Knowles held a hearing on Henning's motion for discovery. [RP 215, 222.]  Henning asserted that the State did not timely supply discovery, and that while DNA testing was completed in 1999, the report of the results was not created until September 2000. [RP 216.] The Court required counsel to work out a timetable to get testing done and results produced.

26.     On October 12, 2000, Gorman filed a motion to compel disclosure of the results of all scientific testing conducted by the State in this case.  Even though it had been almost a year from arraignment, Henning still had not received copies of the results of testing apparently provided to the September 1999 grand jury. [RP 160.]

27.     On November 22, 2000, Gorman filed a motion to determine Henning's competency. Gorman stated that in the course of representing Henning, she had legitimate reason to doubt her client's competency to stand trial. [RP 204.]

28.     On December 1, 2000, Gorman filed a motion to withdraw as Henning's attorney. As grounds for the motion, she stated that the State recently provided the identities of key witnesses,

two of whom had been represented by the Public Defender Department ("PD") in the recent past. Other identified witnesses also had been represented by the PD. The recent witness disclosure raised conflict of interest issues and required that the PD withdraw. The motion stated that the PD had located substitute counsel for Henning. [RP 205.]

29.     On December 1, 2000, Gorman also filed a motion for sanctions, to exclude evidence, or to dismiss, contending that only an incomplete set of grand jury transcripts and tapes was provided and that Henning was not given substantive police reports, taped witness interviews or forensic test results. [RP 207.]

30.     On December 4, 2000, Gorman filed a motion to exclude DNA evidence, arguing that the State had violated the letter and spirit of the rules of discovery and Henning's rights with respect to the production of DNA testing. [RP 216-17.]

31.     On December 8, 2000, the State filed a motion to stay the hearing of Henning's "non-withdrawal" motions. [RP 237.] The State noted that after Defendant filed a motion to determine Henning's competency, Thomas C. Thompson, Ph.D, conducted a neuropsychological consultation of Henning and opined she lacked competence because she was delusional, irrational and unable to maintain a sufficient ability to communicate with counsel. [RP 237.] A hearing on this matter was set for December 15, 2000. But, based on Gorman's December 1, 2000 motion to withdraw, the State argued that if counsel was disqualified by a conflict, she should not represent Henning as to the substantive motions. Thus, the State asked the Court to rule on the motion to withdraw first and stay other proceedings pending that decision. [RP 239.]

32.     On December 13, 2000, Gorman filed a response to the State's motion, arguing that the hearing on Henning's competency should proceed with Gorman as counsel. Gorman noted that

the motion to determine competency was "essentially adverse to the wishes of the defendant." [RP 247.]

33.     On December 14, 2000, the State responded to Henning's motions for sanctions, to exclude evidence and to exclude DNA evidence.  The State argued that on 25 different dates, as many as 14,207 pages, 57 audio tapes, and three videotapes were provided to Henning. [RP 251.] The response also stated that APD Detective Mike Fox completed a 2,912 page supplemental report on September 8, 2000.  On October 30, 2000, the DNA test reports were completed and forwarded to defense counsel.  On November 1, 2000, 514 pages of laboratory notes regarding DNA testing were forwarded to counsel.

34.     On December 15, 2000, Judge Knowles continued the competency hearing and granted Gorman's motion to withdraw. [RP 309.]

35.     On December 27, 2000, Edward Bustamante entered an appearance on behalf of Henning. [RP 312.] A pretrial conference was set for January 25, 2001, and trial was set for February 5, 2001. [RP 313, 314.]

*__2001__*

36.     On January 4, 2001, the State filed a motion to examine Henning. [RP 316.] The State argued that Henning was competent to stand trial and that trial competence should be established by an independent mental examination. [RP 316.] On January 16, 2001, the Court granted the motion for an independent competency exam. [RP 319.]

37.     On January 23, 2001, the State moved for a continuance of the trial date based on voluminous discovery and the upcoming competency examination of Henning.  Henning did not oppose the request. [RP 326.] Trial was rescheduled tentatively to begin in June or July 2001. [RP 331.]

38.     On February 26, 2001, the State filed a Statement of Joinder, joining Diazien, Henning, and Miller in a single criminal proceeding. [RP 349.]

39.     On March 12, 2001, Judge Frank H. Allen, Jr. was assigned to the case. [RP 355.]

40.     On April 4, 2001, Attorney Monica D. Baca entered an appearance as co-counsel with Attorney Bustamante for Henning. [RP 380.]

41.     On April 9, 2001, Henning joined in motions filed by Diazien, to the extent that they were not adverse to her interests. [RP 393.]

42.     On May 25, 2001, the State filed a response to Diazien's motion to sever certain charges against him.  As part of its response, the State revealed that $10,350.00 in cash, an empty Crown Royal bag, and $12,479.70 in coins were found in Miller's safety deposit box.  The State alleged that Diazien paid Miller in cash, coins or jewelry or a combination of all three to murder Girly Chew. [RP 438.]

43.     On July 2, 2001, Judge Allen held a hearing.  The Court noted receipt of Henning's June 19, 2001 letter in which she objected to present counsel and sought new counsel. [Tr.#2, p. 3, July 2, 2001 hearing.] Bustamante explained he understood Henning's frustrations, but he inherited the case with a competency hearing pending that resulted in a delay in filing motions.   In the meantime, Henning remained in jail.  Bustamante believed that his relationship with Henning had deteriorated and that the Court should grant her request for new counsel. [Id., p. 4.] The State did not object.

44.     On July 2, 2001, the Court issued an Order granting Henning's request that she be appointed new counsel. [RP 442.] The PD Office was directed to appoint Henning new counsel. [RP 444.]

45.    On July 17, 2001, the State issued a "Nolle Prosequi as to the Entire Indictment" in CR 99-03647. [RP 459.] The State explained that Henning filed a motion challenging the grand jury's indictment, and to eliminate any question about the indictment, it would dismiss the indictment and seek a superseding indictment.  In addition, the State stated it wished to present the grand jury with additional evidence, both forensic and otherwise.

***Second Indictment of Henning (CR 2001-2063)*** (three volumes of Record Proper)[11]

46.    On July 17, 2001, the second indictment was returned, charging Henning with first degree murder, or in the alternative to Count I, first degree felony murder, conspiracy to commit first degree murder, kidnapping, conspiracy to commit kidnapping, four counts of perjury, one count criminal solicitation to commit perjury, six counts tampering with evidence, and five counts conspiracy to commit tampering with the evidence (20 counts). [RP 2-7.]

47.    On July 27, 2001, Henning was arraigned under the second indictment.  Attorney James Loonam represented Henning for purposes of the arraignment only.  Defense counsel asked that a reasonable bond be set in lieu of the $2.5 million cash only bond.  Judge Allen maintained the same bond. [Tr.#1, p. 4,  July 27, 2001 arraignment.]

48.    The State joined Diazien with Henning.  Miller was no longer part of the same criminal proceeding at this time. [RP 1.]

49.    The State filed a notice of intent to seek aggravating circumstances. [RP 21.]

50.    On August 1, 2001, the State filed a motion to compel selection of counsel for Henning. [RP 22.]

---

[11]The references to "RP" from July 17, 2001 forward are to CR 2001-2063.

51.     On August 13, 2001, Judge W. John Brennan was assigned to the case. [RP 41.] The trial date was again extended. [RP 43.] A hearing on Henning's competency had been set on July 2, 2001, but Henning had no attorney then. [RP 46.]

52.     On August 30, 2001, Gary Mitchell entered an appearance for Henning. [RP 50.] On September 12, 2001, Monica Baca entered an appearance with Mitchell on behalf of Henning.

### *2002*

53.     On January 9, 2002, Diazien pled guilty to the superseding indictment.  [RP 79, ¶ 6.] His plea was to an open charge of murder, first degree murder, willful and deliberate, conspiracy to commit first degree murder, kidnapping, conspiracy to commit kidnapping, tampering with evidence. [Tr.#4, p. 50.]

54.     The parties vacated the trial date in Henning's case. [RP 79, 80.]

55.     After Diazien's guilty plea, the State returned to the grand jury hoping to obtain an indictment of first degree murder as to Miller, whom a grand jury had previously indicted for conspiracy and lesser charges. [Tr.#25, pp. 63-64.]

56.     In late May 2002, the State called Diazien as a witness at the second grand jury proceeding as to Miller.  Instead of indicting Miller with harsher charges, the grand jury only charged Miller with several counts of tampering with evidence. [Tr.#4, pp. 169-75; Tr.#25, pp. 63-64, 69.] Miller was scheduled to go to trial on the remaining tampering charges on April 21, 2003. [Tr.#28, p. 8, Apr. 16, 2003 evidentiary hearing in Henning.]  He pled no contest to three counts of tampering with evidence.

57.     Henning's attorneys filed a number of motions in July 2002, including a motion for discovery, motion to disclose tapes of conversations and interviews, notice to preserve defense against competency and capacity, motions in limine, motion to disclose "deals" that were made,

motion for pretrial judicial review of sufficiency of evidence to proceed with aggravating circumstance at trial on the merits, motion to dismiss and bar the death penalty, motion to disclose information relating to mitigating circumstances, motion for the court to instruct the jury defining a life sentence, and a motion to preclude removing for cause jurors who are not "death qualified." [RP 136-229.]

58.    The State filed a motion to allow use of co-conspirator statements and other motions. [RP 230-257.]

59.    On August 8, 2002, Henning withdrew the earlier motion to determine competency. [RP 288.]

60.    On August 12, 2002, Judge Brennan conducted a pretrial hearing on motions. [Tr.#3; RP 336, second indictment.] Attorneys Gary Mitchell and Monica Baca appeared on behalf of Henning. [Id., p. 3.] The State noted that Henning recently withdrew the incompetency motion, thereby representing that she was competent to stand trial. [Id., pp. 5, 8.] The case was set for trial on September 23, 2002.  Counsel argued the pending motions.  Judge Brennan took some motions under advisement.  He also indicated that he did not know whether plea negotiations were ongoing but that if there was any opportunity that the case be pled, counsel should talk about it now as opposed to a month later when the case would be ready for trial and a plea would be more difficult to achieve. [Id., p. 62.] [See RP 336-340 for rulings on motions, second indictment.]

61.    On August 13, 2002, the Ogden hearing proceeded before Judge Brennan. [Tr.#4.] The State called witnesses,[12] including expert forensic witnesses, who discussed the evidence that

---

[12]Henning argues repeatedly that she did not have an opportunity to cross-examine Det. Gonzales due to his death, and that he was the lead detective in this case. Det. Mike Fox, who testified at trial and at the Ogden hearing, was the lead detective in the case and was involved when the investigation first ensued. [Tr.#4, pp. 43, 121.]

was collected and tested. Defense counsel cross-examined the State's witnesses, and both parties presented closing arguments.  Attorney Mitchell argued that the evidence was not sufficient to support a death penalty proceeding.  Judge Brennan found that under the pertinent standard, which was a "fairly low" standard, there was probable cause "to bring this aggravating circumstance that a murder occurred during the course of a kidnapping." [Id., pp. 213-14.]

62.     On August 30, 2002, the State filed a motion to compel Miller's testimony and to grant him immunity. [RP 341.] The State noted that Miller currently was under indictment on five counts of evidence tampering and was unlikely to testify as he was expected to assert.  This motion to compel was subsequently withdrawn by the State. [RP 351.]

63.     On September 23, 2002, the Court began jury selection.  Attorney Mitchell pointed out that the Albuquerque Tribune printed a lengthy article on the case that morning.  [Tr.#5, p. 6.] Mitchell stated that he was not moving for a change of venue at that time but asked the Court to mark the article as an exhibit should venue become an issue.  The Court marked the newspaper article as an exhibit. [Id., p. 7.]

64.     The Court determined that it would initially question larger groups of the potential jurors and then take individual jurors into chambers for interviews regarding some of the death-penalty issues in the case, along with other issues.  Very detailed questioning of the jury panel ensued.  The Court and counsel asked jurors questions.  Jury selection began on September 23, 2002 and concluded on September 26, 2002. [Tr.# 5, 6, 7, 8, Sept. 23-26, 2002 jury selection.]

65.     The Court advised the jury that the local media and Court TV would be present televising parts of the trial, but that they were not allowed to film jurors. [Tr.#8, pp. 8-9.]

66.     During jury selection and *voir dire*, the Court carefully managed the process and did not allow counsel to "try the case" in *voir dire*.  For example, the Court did not permit the State to

15

ask potential jurors about their reactions if they learned no body had been recovered in the case. [Tr.#8, p. 30.]

67.     On October 1, 2002, the trial began.  The Court instructed the jury throughout jury selection and the trial that it must not consider any news accounts of the case. [*See, e.g.,* Tr.#9.] In Attorney Mitchell's opening statement, he spoke of Diazien, who was to be the defense's key witness at trial, as someone who preyed upon people and who was "absolutely a con artist." [Tr.#9, pp. 45-48.]     68.     From October 1, 2002 through October 15, 2002 [Tr.#9-18], the State presented its case, and defense attorneys cross-examined the State's witnesses.  Defense counsel made a number of objections regarding the admission of evidence, some of which were successful. The State presented at least four expert witnesses.  On October 15, 2002, the State rested. [Tr.#18, p. 14.]  The jury was excused while defense counsel presented a motion to dismiss and a motion for directed verdict. [Tr.#18, pp. 14-17.]

69.     The Court denied the motion to dismiss indictment.  Notwithstanding some concern about the perjury charges, the Court denied the motion for directed verdict in its entirety. [Tr.#18, pp. 24-38.]

70.     On October 15, 2002, the defense began its presentation of evidence by calling Diazien.  He testified during part of October 15, 2002 and October 16, 2002. [Tr.#18, pp. 40-218; Tr.#19, pp. 15-174.] The defense also called Michael Harvey as a witness, who was a friend of Henning.  The defense briefly re-called Detective Fox to the stand.  The defense did not present any expert witnesses although counsel for Henning subjected the State experts to cross-examination.

71.     On October 16, 2002, the State presented some rebuttal testimony.  Evidence was concluded on October 16, 2002. [Tr.#19, p. 243.]

72.     On October 17, 2002, the jury was instructed. [Tr.#20, Oct. 17, 2002 trial.]

16

73.     On October 18, counsel presented closing arguments and the jury began to deliberate on October 18, 2002.  They continued to deliberate through October 25, 2002, and reached a verdict on October 25, 2002, finding Henning guilty of felony murder and various other charges as stated. [Tr.#21-24, Oct. 18, 19, 22 and 25, 2002.]

74.     On October 29, 2002, the death penalty-qualified phase proceeded.  Mitchell stated he intended to file a motion for acquittal notwithstanding the verdict but could not do so at that time. Mitchell argued that the death penalty-qualified proceeding was prohibited under double jeopardy. [Tr.#25, p. 12.] The Court denied the motion subject to revisiting it again. [Id., pp. 22-23.]

75.     At the death penalty proceeding, both parties presented opening statements.  The State presented some evidence, but the defense presented no evidence.  The jury deliberated about 25 minutes before determining that Henning would receive life, not death. [Id., pp. 108.]

76.     On October 31, 2002, court convened for a sentencing proceeding. [Tr.#27.] The State filed a notice seeking to aggravate the sentences by one-third and to run the sentences on the noncapital felonies consecutively to each other and the first degree felony murder conviction.  [Id., p. 3.]  On October 31, Judge Brennan stated he was still trying to decide whether to conduct final sentencing that day. [Id., p. 5.] Mitchell argued to the Court that there was a change in Henning's attitude towards Diazien when she heard him testify and that Diazien's testimony finally "brought home" to her what Diazien did.  [Id., p. 10.] Mitchell also argued against the State's intent to aggravate the sentences.

77.     At the October 31, 2002 hearing, Mitchell told the Court that he believed "we received a fair trial from you, and you were a fair judge, and I do this with great respect and dignity in this court, and I appreciate the way you ran your court." [Id., p. 13.] The Court similarly

complimented all counsel on the professional behavior they exhibited during trial and for the excellent job counsel did on behalf of their clients. [Id., p. 15.]

78.     Judge Brennan elected not to sentence Henning on October 31, 2002.  Instead, he requested a psychological evaluation to better understand any mental problems she had and to impose an appropriate sentence. [Id.] Judge Brennan told Henning he believed, whether correctly or not, that she was involved but that he felt she was one of Diazien's victims.  He hoped that during the 60-day evaluation, Henning would reflect and think about what occurred.  Judge Brennan explained if Henning were able to be more helpful, the State had other options that they could offer to help her.  The Court, however, wished to at least give Henning this last opportunity to help herself. [Id., p. 16.]  The Court further stated that it would do whatever it could in giving Henning the minimum sentence and to run the sentences concurrently.

79.     On October 31, 2002, Henning brought a motion for judgment of acquittal notwithstanding the verdict and a motion for new trial based on newly discovered evidence. [RP 387.] Mitchell argued that all convictions should be dismissed because they were not supported by the evidence and due to inconsistency of the verdict.  Henning did not challenge the DNA evidence, nor the evidence located at Girly's apartment, etc., because the defense theory was that Diazien planted Henning's blood in Girly's apartment and there were innocent explanations as to why other evidence turned up linking Henning to the crime. [RP 393.]  In addition, the defense continued to argue that the perjury charges should be dismissed for lack of notice as to the specific statements at issue.  Last, Defendant contended that after the jury began its deliberations, new evidence was discovered that Miller's vehicle had been seen in the karate studio's parking lot during the week of Girly's disappearance.

80.    The motion was briefed, and the Court held a hearing on November 22, 2002. [Tr.#30, November 22, 2002 post-trial motion hearing.] During that hearing, Mitchell withdrew the motion for new trial based on new evidence as he stated he had not yet "flushed out" the new evidence. [Id., p. 38.] The Court denied the motion. [Id., p. 48; RP 440, 658.]

81.    On February 21, 2003, the State filed a motion for evidentiary hearing regarding Henning's sentencing. [RP 702.]  Evidence was produced showing that Miller's investigator told someone he or "they" knew the location of Girly's body.  The State believed such information, if true, might affect Henning's sentencing.  Miller's attorney filed a motion to enter an appearance, to object to the evidentiary hearing and to participate, if it was held. [RP 705.] At that time, Miller's case was pending before Judge Knowles. [RP 705, 706.]

82.    On April 16, 2003, Judge Brennan held the evidentiary hearing.  [Tr.#28.] The location of Girly's body was not revealed.

83.    On April 18, 2003, Henning was sentenced. [Tr.#29.] The State presented testimony at the sentencing proceeding; Mitchell did not. [Id., p. 22.] Henning made a statement on her behalf at the sentencing.  She stated that she never asked Diazien to testify at her trial and that her attorneys knew that.  She believed Diazien was lying and that there was evidence of sloppy and fraudulent evidence gathering and handling by APD that was not elicited at trial. [Id., p. 51.] The Court elected to run the sentences consecutively but not to aggravate them as requested by the State.  Pursuant to NMSA 1978 § 31-18-15.1 (1993),[13] the trial judge could have increased the sentence by one-third due to the presence of aggravating circumstances.  The Court reviewed Henning's psychological evaluation, which showed she was competent.  The Court hoped Henning would come forward and

---

[13]*But see* State v. Frawley, 143 N.M. 7, 17 (2007) (subsequently finding sentencing statute § 31-18-15.1 facially unconstitutional).

be more frank about any information she had.  Judge Brennan earlier indicated that if Henning was

forthright and cooperative, it would be beneficial to her at sentencing, but this did not occur. [Id.,

p. 64.]

84.     On May 5, 2003, the Judgment, Sentence and Commitment were entered.  Henning

received a total sentence of life plus 43.5 years or 73.5 years. [RP 724-26.]

85.     On May 20, 2003, Attorney Mitchell filed a notice of appeal. [RP 739.]

86.     On May 20, 2003, the Court appointed appellate counsel for Henning. [RP 751.]

87.     On June 18, 2003, Attorneys Mitchell and Baca filed Henning's appellate statement

of issues.  [RP 789.] Henning made a number of arguments, including that the convictions were not

supported by sufficient evidence and the verdicts were inconsistent.  Defendant also argued that the

state court erred by denying the motion for acquittal, denying Henning's Ogden motion, failing to

change venue, selecting or excusing certain jurors, admitting a "drop cloth package," admitting a

statement that Diazien told someone he was hiring someone to hire someone else to murder Girly,

admitting a witness' statement by Diazien to the effect that Girly would not live to see any of the

divorce proceeds, allowing testimony about Henning and Diazien changing into cats when they had

sex, allowing admission of a sword, allowing a partial admission of a letter from Diazien addressed

to Henning concerning Miller, allowing a police officer to demonstrate that a button found in

Henning's car possibly matched another button missing from clothing belonging to Girly Chew,

admitting a letter written by Henning, admitting an article of clothing, admitting the passport

calendar of Girly's travels, refusing to admit an Allied Van's receipt, giving UJI instruction

regarding aiding and abetting, refusing to grant Henning's motion to dismiss all perjury counts, and

allowing voir dire of the jury panel regarding aiding and abetting. [RP 789-800.]

88.     On June 4, 2004, Henning, through appellate counsel, filed a motion to supplement the record on appeal, including video tapes, video transcript, grand jury tapes, the taped conversation between Henning and Miller, jury notes and jury instructions not given. [RP 871.] The New Mexico Supreme Court allowed amendment. [RP 874.]

89.     The State also filed a motion to supplement the record which was initially denied. However, the New Mexico Supreme Court subsequently allowed amendment. [RP 885, 884.]

90.     On January 12, 2005, the case was reassigned to Judge Murdoch. [RP 895.]

91.     On April 25, 2006, the New Mexico Supreme Court issued its opinion on Henning's appeal. [RP 900.] In its list of issues raised, the Supreme Court included insufficiency of evidence to support Henning's convictions for felony murder, kidnapping, and conspiracy to commit kidnapping, ineffective assistance of counsel, double jeopardy violations and cumulative error. [RP 901-02.] The Court found, in part, that the four perjury convictions should be reversed as there was inadequate notice of the perjury charges that faced Henning. [RP 915.]

92.     The New Mexico Supreme Court also addressed Henning's argument that trial counsel was ineffective for failing to file a motion to suppress the DNA blood evidence found in Girly Chew's apartment that matched Henning's DNA.  The Supreme Court rejected Henning's arguments that trial counsel was ineffective for not retaining a DNA expert to testify, the State should not have consumed the "blood evidence" in testing, and trial counsel was *per se* ineffective for failure to challenge the DNA evidence.  [RP 916.] The Supreme Court reasoned that a rational trial strategy existed to explain counsel's conduct.  The Supreme Court rejected all other issues raised on appeal as well. [RP 921-22.]

93.     On October 3, 2006, Henning, acting *pro se,* filed a state habeas petition. [RP 923.] The petition was 60 pages long and included numerous exhibits.  The claims are too numerous to

repeat here.  On July 20, 2007, Henning filed an addendum to her state habeas petition.[14]  [RP 1063.]

On August 7, 2007, Judge Murdoch denied the state habeas petition, addressing some of the

arguments specifically, including Henning's position concerning expert testimony and credibility

issues. [RP 1091.]

94.    On August 27, 2007, Henning filed a petition for writ of certiorari. [Doc. 12, Ex. L.]

In her petition, she set out many of the same claims set out in the state and federal habeas petitions,

including prosecutorial misconduct, ineffective assistance of counsel, and abuse of discretion by the

trial court.  She also attached her entire state habeas petition to the petition for writ of certiorari. On

September 21, 2007, the New Mexico Supreme Court entered an Order denying the petition for writ.

[Doc. 12, Ex. M.]

95.    On March 26, 2008, Henning filed the present federal habeas petition. [Doc. 1.]

### Evidence Presented at Henning's Trial[15]

96.    Girly Chew was married to Diazien for about six years.  In 1997-98, she contacted

an attorney to start divorce proceedings against him, but she did not file her petition until early 1999.

[Tr.#11, pp. 108-09.] Girly was unable to have children which was a great disappointment to her and

Diazien.  [Tr.#9, pp. 111-12; Tr.#11, p. 128.]  During their marriage, Diazien unexpectedly brought

home a child, whom he claimed he adopted while on a business trip. [Tr.#10, p. 135, Oct. 2, 2002

Trial.] Diazien maintained that he "harvested" the biological mother's eggs while she was in Canada

and genetically engineered the "creation" of the child.[16]  [Id., pp. 102-105; Tr.#11, p. 49.]  However,

---

[14]The Court did not consider this "addendum" in reviewing the issue of exhaustion because the parties had not presented the addendum as part of the record at that time. [Doc. Nos. 23, 24.]

[15]This summary of evidence is taken primarily from the New Mexico Supreme Court's denial of Henning's direct appeal, Hennings' appellate pleadings, and the trial transcript.

[16]Due to the child's minority, he is identified herein only by the initial "D."

Diazien was the biological father and had custody of him. [Tr.#9, p. 67.]  Diazien apparently gained custody of the child by telling the biological mother that the child inherited a deadly disease and he was the only person with resources to care for D. [Tr.#10, pp. 151-55.]  In 1999, the child was three years old.

97.     Diazien, then known as Armand Chavez, was born in Houston, Texas on about March 5, 1965.  He changed his name to Diazien Hossencofft in 1992. [Id., pp. 136, 144-45.]  He claimed he attained a degree in biochemistry and chemistry.[17] [Id., p. 147.]  He was married "a few times" and fathered several children, including D. [Tr.#18, pp. 39-40.] Diazien untruthfully represented that his first wife in California died in a terrible car accident. [Tr.#11, pp. 38-40.]

98.     Diazien prides himself in being an excellent "con" man.  He admitted he spent his entire life conning people. [Tr.#18, p. 173.] He had an extensive resume prepared but conceded it was almost entirely false. [Id., p. 209.]  Through his schemes, Diazien amassed a good deal of money and lived an affluent life, e.g., he drove a late model Jaguar.  Diazien drew blood from a number of women and men, which he kept in vials in his refrigerator. [Tr.#11, p. 40; Tr.#18, pp. 95, 97-98.] He promised women injections that would delay the aging process or cure cancer.  He intended to charge one girlfriend over a million dollars for twelve injections a year for six years, at $32,000 apiece, or at a discounted rate of $3200 per shot. [Tr.#11, pp 40- 44.]  Diazien was paid hundreds of thousands of dollars by gullible woman who believed Diazien's injections (of Vitamin B6 or B12) would cure their cancer or prevent aging. [Tr.#11, p. 45; Tr.#18, p. 150; Tr.#19, p. 30-35, Oct. 16, 2002 trial.]

---

[17]Many of his claims concerning educational attainment and professional experience were false.

99.     In addition, Diazien held himself out to be a doctor and an expert in DNA or genetics. He was neither.  [Tr.#9, p. 105.] He told some people he was a genetic researcher or genetic engineer and  he sometimes claimed he was a surgeon in California and worked for the NSA. [Tr.#10, p. 131; Tr.#11, p. 38.] He was none of the above, and he held no job in 1999. [Tr.#9, p. 121; Tr.#10, p. 147; Tr.#11, p. 208; Tr.#18, p. 214.] He was never a doctor.  Earlier, Diazien was provisionally accepted into the University of Utah School of Medicine but upon discovery that his school credentials were fraudulent, he was dismissed from the program. [Tr.#10, p. 136.]

100.     In 1999, Diazien claimed to be dying of leukemia, and at times was seen hooked up to IV's in his home and coughing up blood. [Id., pp. 90, 123; Tr.#11, p. 60.]  He was not dying; he was not sick; and, the IV's and blood were nothing more than props. [See Tr.#10, pp. 132-32.] Diazien's explanation for his "illnesses" was:  "I'm sick with whatever malady that I feel I have, yes." [Tr.#18, p.134.]

101.     In February 1999, Girly left Diazien because of his domestic abuse and violence. [Tr.#9, p. 68; Tr.#10, p. 139.] Diazien beat and choked her, and as a result, Girly filed a domestic violence proceeding against him in 1999. [Tr. #9, p. 68, Tr.#11, pp. 110, 139.]  Girly moved to an apartment not far from their home, but, due to her fear, she made every attempt to keep secret the location of her apartment. [Tr.#9, pp. 69, 107.]  Diazien made death threats to her. [Tr.#9, pp. 70-71, 88; Tr.#10, pp. 104, 106, 139; Tr.#11, p. 144.]  Girly Chew informed friends and co-workers that Diazien intended to kill her. [Tr.#9, pp. 71-73, 81.] Her friends and co-workers were protective of Girly and kept track of where she was. [Id., pp. 74, 80-81.]  The night before her disappearance, she contacted the FBI to inquire into an ongoing investigation regarding the possibility that Diazien kidnapped D from the biological mother.  Girly asked the FBI whether Diazien would be arrested

and if the FBI could do anything to protect her.  [Tr.#10, pp. 139-140, 148.]  In 1999, Girly began taking karate lessons in order to protect herself. [Tr.#9, p. 81.]

102.    Girly initially believed Diazien's stories that he was a doctor and was dying of leukemia.  [Tr.#9, p. 99; Tr.#11, pp. 136-37.]  In February 1999, when she moved out, she told her supervisor at work that she learned that Diazien was not a doctor and was not dying. [Tr.#9, pp. 99-100.] Girly told her divorce attorney that she had found information in their house showing that Diazien was deceiving people and had been doing so for a long time. [Tr.#11, p. 124, 134.] Girly intended to go to the FBI on September 13, 1999 and expose Diazien as a fraud.  [Tr.#3, p. 67, Aug. 12, 2002 motion hearing.]

103.    On August 18, 1999, several weeks before Girly's disappearance, Diazien contacted an adoption agency in Albuquerque, seeking to facilitate an open adoption plan for D.  Diazien claimed to have only four to five months to live before he would die of leukemia.  He wanted the adoption to be finalized as quickly as possible. [Tr.#10, pp. 96-100.] Initially, Girly had sought to maintain contact with D.  She even paid Diazien child support from her $18,000 salary until her death. [Tr.#11, p. 120.]  At some point, Girly decided that she could no longer pursue any parental rights or even visitations with D because of danger to her own life. [Id., p. 127.]  She agreed to relinquish to Diazien any parental rights she had.

104.    On about August 26, 1999, after Diazien learned that Girly Chew signed the pertinent legal documents relinquishing her parental rights over D, Diazien told the adoption agency manager that "there will be justice." [Tr.#10, pp. 111-12.] Diazien did not explain what he meant other than it was a reference to "karma." [Id., p. 112.]

105.    Diazien maintained a number of romances with women during his marriage.  While still married to Girly and involved in a relationship with Henning, he was also intimately involved

25

with Julie McGuire, whom he met through the internet. [Id., pp. 191-92.] In August 1999, Diazien

told McGuire that as soon as Girly relinquished rights to D, he was going "to take Girly out" or

cause her to "disappear."  Diazien claimed he hired someone to do this, and that the plan involved

two people in addition to Diazien, one of whom was a man.  [Id., pp. 194-97; Tr.#11, p. 76.] When

McGuire asked how he could afford to hire someone, Diazien said he would pay the assassin with

diamonds. [Tr.#10, p. 198.] He told McGuire that missing people cannot be found when they are

dissected. [Id.]  He further told McGuire that Girly would never live to see a dime of the money[18]

to which she might be entitled after the divorce because "she's going to come up missing." [Tr.#11,

pp. 26-27.]

106.    Near the same time, Diazien was also engaged to be married to another woman,

Cheryl Culp, a resident of South Carolina. [Tr.#10, p. 152.] In the early morning hours of September

10, 1999, Ms. Culp arrived in Albuquerque and spent part of that morning with Diazien, who had

earlier left Henning's house. [Tr.#18, p. 121, 126.]  Diazien and Culp drove to South Carolina on

September 10th, after Diazien and Henning lunched together at the Tomato Café. [Id., pp. 145-46;

Tr.#12, p. 26.]

107.    In September 1999, Henning was a marketing specialist for Atlas Resources, a

company that ran payroll for small businesses. [Tr.#10, pp. 165, 183; Tr.#12, pp. 65-68.] For some

period of time, Henning successfully brought in new clientele. [Id., p. 82.] She was a successful

business woman, well-educated, and had no prior criminal record.

---

[18]With respect to the divorce proceeding or possible settlement, Girly sought some of the equity in the
house so that she could start her life anew. [Tr.#11, p. 118.]   The amount of money she might have obtained as a
result of a divorce settlement was about $53,000. [Id., p. 119.]

108.    Henning met Diazien at a conference in Albuquerque in late June 1999. [Tr.#11, pp. 132-36; Tr. #12, p. 135; Tr.#18, p. 177.]  The conference pertained to metaphysics, which was a topic of interest to Diazien and Henning (and Miller).  They all had an interest in extra terrestrials and UFO's. [*See* Tr.#16, p. 54, Oct. 10, 2002.]  Diazien, at times, claimed that he was an alien being from another planet and was immortal.

109.    Henning, believing Diazien was dying, claimed to be his "caretaker" in the Summer of 1999. [Tr.#11, pp. 116-17; Tr.#12, p. 128.] She attended Diazien's divorce proceeding deposition on August 4, 1999, and was taking care of him because of his alleged leukemia. [Tr.#11, p. 116.] Diazien carried around an IV bag that day, and Henning was purportedly attending to his medical needs. [Id.]  Henning was also sexually involved with Diazien during the Summer and Fall of 1999. [Tr.#18, p. 179.]

110.    In the first week of September 1999, Henning told co-workers that she was going to marry Diazien the next week.  When her previous co-workers mentioned that Diazien was not yet divorced, Henning told them that would be "taken care of" next week. [Tr.#12, pp. 101-03, 109, 112.]   She had known Diazien for only about six weeks before Girly Chew's disappearance. [Tr.#18, pp. 147-48.]

111.    Prior to September 9, 1999, Diazien told people around him that he wished to have Girly Chew killed. [Id., p. 60.] As early as February, 1999, Diazien talked of having Girly killed. [Id., p. 53.]  Henning introduced Miller to Diazien. [Id., pp. 54-55.]  Miller was a friend of Henning's, and he, too, might have been intimate with Henning. [Id., p. 141.]

112.    When Girly Chew did not report to work on September 10, 1999, her supervisor called APD to report she was missing. [Tr.#9, pp. 83-84.] Two police officers went to Girly's apartment to conduct a welfare check but did not find her.  They obtained a search warrant, entered

Girly's apartment, but did not find Girly.  Instead, they found several large bleach stains on Girly's carpet that tested positive for blood. [Tr.#12, p. 124; Tr.#17, pp. 128-30, Oct. 11, 2002 trial.]  The stains were moist to the touch. [Tr.#9,  p. 137.] There was a strong odor of bleach. [Id., p. 133.] The apartment looked freshly vacuumed or cleaned, with no sign of forced entry. [Id., pp. 133, 136.]

113.    On September 10, 1999, the same day Girly was reported missing, a state highway employee working along a remote stretch of road near Magdalena, New Mexico observed a tarp or "drop cloth," smeared with blood, lying on the ground near the shoulder of the highway, about two hours southwest of Albuquerque. [Tr.#10, pp. 23-24.]  A few feet from the tarp, the worker found a woman's blouse, shorts and underwear, stained with blood.  The State Police took custody of the tarp and clothing and collected additional items in the area, including two pieces of duct tape, one with strands of hair attached, and some bloody gauze. [Id., p. 29-32, 50-54.] The State Police provided all these items to APD for DNA testing. [Id., pp. 61-65.]  DNA analysis indicated that the blood on the items was Girly's, and that the hair on the duct tape was consistent with her hair. [Tr.#17, pp. 120-21, 142.]  In addition to blood, some of the clothing, including the panties and women's shorts were urine-stained. [Tr.#17, pp. 92-107.] There was also a mixed stain of body fluids on some of the clothing that was consistent with known samples from Girly and Diazien. [Id.]

114.    Several items of physical evidence linked Henning, Diazien, and Miller to Girly Chew's kidnapping and murder.  A forensic scientist conducted DNA analysis on the carpet removed from Girly Chew's apartment.  The analysis revealed four small blood stains that matched Henning's DNA and two blood stains that matched Girly's DNA. [Tr.#17, pp. 135-36.]  DNA analysis was also conducted on small blood smears found on Girly's couch.  This blood matched Henning's DNA profile. [Id., p. 139-141.]

115.    Additionally, trace evidence from the carpet in Girly's residence included one hair sample consistent with Henning's hair, meaning the hair could have been Henning's. [Tr.#17, pp. 11, 40, 47]. Particles of art sand and glitter were found in Girly's apartment, and they matched art sand and glitter found in Henning's garage. [Tr.#16, pp. 151, 169.] Cat hairs were also lifted from Girly's carpet that were consistent both with Henning's cats and Miller's cats. [Tr.#17, p. 14.]

116.    A hair was removed from the tarp/drop cloth found near Magdalena that initially was tested as consistent with Miller's hair. However, after mitochondrial DNA analysis, the hair was found consistent with Henning's hair. [Id., pp. 16, 122; Tr.#16, pp. 18-19, 21-23.]

117.    The police also located dyed animal hairs, dog hairs, and feather fragments on Girly's carpet and the tarp. Some of these were consistent from samples found in Miller's residence. [Tr.#17, pp. 16-17, 26.]

118.    In addition to the physical evidence, Henning's actions, both before and after September 9, 1999, circumstantially linked her to Girly Chew's kidnapping or murder. In the Fall of 1999, Henning told the grand jury that she did not know Girly and had never met her. However, Henning's banking records revealed that on August 20, 1999, Henning interacted personally with Girly during a bank transaction, and that Girly Chew's name was visible both on bank name tag and at her teller window. [Tr.#9, pp. 76-78; Tr.#12, p. 41.] Henning again went to the bank where Girly worked on August 26th and September 3, 1999. [See Tr.#9, pp. 25-26, Opening Statement.] Henning also told the grand jury that she did not know where Girly lived. Although she professed to the grand jury that she did not know where Girly lived, a friend testified at trial that Henning pointed out Girly's apartment as they drove past it on September 17, 1999. [Tr.#16, p. 73.]

119.    In the days and weeks prior to Girly's disappearance and murder, Henning, Diazien, and Miller engaged in a number of suspicious activities. For example, in the weeks leading up to

29

the murder, Diazien and Miller each listed their homes for sale.  Henning's home was also being prepared to sell;[19] Diazien's movers came to his house several days before Girly's disappearance, and his house was empty by September 9, 1999.  [*See* RP 237, second indictment; Tr.#4, pp. 129, Aug. 13, 2002 Ogden hearing.]

120.    In August 1999, Henning and Miller visited a remotely-located ranch,  about 26 miles north of Magdalena [Tr.#11, pp. 157-58], and the tarp, bloody clothing, and other physical evidence were found on the side of the road near Magdalena.  Near the end of August 1999, Henning and Diazien ate at a restaurant in Socorro, about 35 miles east of Magdalena. [Id., p. 175; Tr.#12, p. 23.]

121.    In late August 1999, when Diazien's son was  taken by the adoptive family, Diazien was seen in his home with a shotgun and a 9 millimeter handgun. [Tr.#9, pp. 161, 163, 178.] A little later that same evening, he was seen eating at a local restaurant with Henning, whom he introduced as someone from the Leukemia Foundation. [Tr.#10, pp. 117-120.] Henning had no affiliation with that Foundation.

122.    On September 8, 1999, Henning accompanied Diazien to a recreational  vehicle dealership, American RV, in Albuquerque. [Tr.#11, p. 179.] Diazien told the dealer that he and Henning were looking at RV's because they wanted to travel to Mexico.  [Id., p. 181.] Diazien commented on the size of one RV compartment, saying it was "large enough to hide a body." [Id., pp. 181-82.] Diazien appeared sick while at American RV, and Henning explained to the salesperson that he had leukemia. [Id., 189.] Diazien and Henning made an appointment to return to American RV on the morning of September 10th. [Id., p. 183.]  Later in the evening of September 8th, Henning went to a Home Depot store in Albuquerque and purchased a tarp/drop cloth, the same size and style

---

[19]This evidence was presented at the Ogden hearing.  The Court did not determine whether the same evidence was presented to the jury.

as the one found smeared with blood, near Magdalena. [Tr.#10, p. 81; Tr.#12, pp. 28-29.]   On September 7 and again on September 9, 1999, Henning purchased gasoline for her car. [Tr.#12, pp. 25-26.] Round trip distance between Albuquerque and Magdalena is about 240 miles.

123.   Diazien spent the nights of September 8 and 9, 1999 with Henning, but Henning told police she did not know where he had gone on September 10, 1999 and that she did not expect to speak to him again. [Tr.#9, pp. 174-75.]   On September 12, 1999, Henning told a police detective that she was only a care giver for Diazien and that he had been sick and had moved a day or two earlier. [Tr.#12, p. 128.] She did not disclose that she was intimately involved with Diazien.

124.   On September 1, 1999, Henning rented a set of walkie-talkies for a two-week period. [Tr.#10, pp. 167, 169.]   On the day of the murder, Henning and Diazien were seen using the walkie-talkies in an Albuquerque bookstore.   An acquaintance of Henning's saw her and described her behavior as "nervous and erratic." [Tr.#11, p. 192.]   Miller was present at the bookstore with Henning and Diazien in the late afternoon of September 9, 1999.   Henning told the acquaintance that there was a very high amount of energy in the lovemaking between her and Diazien, and that they transformed into "cat-like" people.   She lifted her lip and showed the acquaintance where purportedly fangs would grow out of her mouth during their sexual encounters. [Id., p. 198.]

125.   Diazien was seen outside his home on the evening of September 9, 1999, with his face and skin painted black and wearing camouflage clothing.   He had driven to his house in Henning's vehicle. [Tr. #11, pp. 215-17; Tr.#14, pp. 101-06.]

126.   Henning's unusual behavior continued after September 9, 1999.  On September 11, 1999, two days after Girly's disappearance, Henning washed her vehicle and had the tires realigned. [Tr.#12, p. 130; Tr.#13, p. 20, Oct. 7, 2002 trial.]   She washed the car again three days later on September 14. [Tr.#12, p. 57.] During the week of September 12, 1999, Henning spoke to her friend

Mary Alice Thomas and told Thomas that Girly had been kidnapped and killed. [Tr.#16, pp. 44, 57.] That information, however, was not yet publicly known.  Henning also actually told Thomas that D had been kidnapped and killed and that D's "head had been cut off and he had been cryotically [sic] frozen and his head was shipped to Malta." [Id., p. 58.]  On September 17, 1999, Henning showed Ms. Thomas a "ninja" sword given to her by Diazien.  The sword was hidden in the ceiling of Henning's garage. [Tr.#16, pp. 36-37.]  An identical sword was earlier purchased by Diazien on September 9, 1999. [Tr.#12, pp. 4-8.] Later analysis revealed that blood on the handle of the sword matched Diazien's DNA. [Tr.#17, p. 112.] Human blood was found on the blade of the sword but its source could not be identified. [Id., p. 114.]

127.    A few days after Henning testified before the grand jury in September 1999, she spoke with Miller. [Tr.#14, pp. 11-12.]  In the week after Girly's disappearance, one of Henning's co-workers noted Henning made a lengthy long-distance phone call to Diazien in South Carolina. [Tr.#12,  pp. 80-81.]

128.    The shotgun earlier seen at Diazien's house on August 27, 1999, was later found in Henning's home closet.  Police also found a .22 Baretta handgun at Henning's home.[20] [Tr.#11, p. 141.]  When asked by the grand jury whether she knew where the .9 mm handgun was, she stated she gave it to Diazien when he left [on Sept. 10, 1999] for protection. [Tr.#14, pp. 6-7.]  Later, two .9 mm rounds were found in Henning's vehicle. [Id., p. 17.]  The bullets found in Henning's vehicle were the same caliber as the guns earlier seen at Diazien's home. [Tr.#14, p. 14.] When the Tarus

---

[20]Henning indicated at some point that she had three firearms – a shotgun, a .9 mm Tarus, that was recovered in South Carolina after a search of Diazien's home was executed, and a .22 Baretta. [Tr.#15, p. 41, Oct. 9, 2002 trial.] Henning stated during grand jury proceedings that since Diazien was moving, she wanted her weapons back and she moved them from his house to her home in one of her cars. [Id. p. 43.] Then she gave Diazien the .9 mm Tarus before he left on September 10, 1999. [Id., p. 43.] There was also evidence presented that a "weapons check" on the .9 mm Tarus revealed Bill Miller bought the gun from someone else on May 4, 1999. [Tr.#15, p. 120.]

handgun was analyzed for evidence, a blood stain on the weapon was identified as belonging to a female. [Tr.#17, p. 118.] In addition, a button was found in Henning's vehicle that might have belonged to Girly's shorts that were found in Magdalena. [Tr.#14, pp. 18, 24-25.]

129.    Henning advised her friend Ms. Thomas that Thomas did not need to answer grand jury questions regarding statements Henning had made to her and that Thomas could take the "Fifth." [Tr.#16, pp. 39-40.] Henning also asked Thomas to hide some gold-colored CD's for her and not to turn them over to the police. [Tr.#14, p. 36; Tr. #16, pp. 41-42.]

130.    On September 21, 1999, Diazien was arrested on federal charges of using a telephone to harass three witnesses associated with this case, including Felissa Garcia Kelley (Diazien's divorce attorney), Vonda Cheshire (adoption agency manager), and Maryann Skidmore (Diazien's neighbor who saw him painted in black and wearing camouflage clothing on the evening of 9/9/99). [Tr.#10, pp. 142-43.]

131.    After grand jury deliberations, Diazien, Henning and Miller were all initially indicted on charges relating to Girly Chew's disappearance and murder.

132.    While in jail awaiting trial on the indictments, Diazien and Henning exchanged many letters over at least six to eight months. [Tr.#14, p. 49.] In one of the letters to Henning from Diazien, Diazien described Miller as the perfect "escapegoat" [sic]. [Id., p. 77.]

133.    On January 14, 2002, Diazien pled guilty to the non-capital crimes of murder of Girly Chew, kidnapping and other charges. [Tr.#18, p. 42.] He admitted to master minding Girly's kidnapping and murder, but disclaimed knowing exactly how she was killed or where her body was located. "However she was killed, it makes no difference to me . . . .Hopefully, for my end of it, that she suffered the most excruciating pain known to mankind is what I was hoping for." [Id., p. 46.] As a result of the plea agreement, Diazien was incarcerated for over 90 years. [Id., p. 43.]

134.     Diazien testified at Henning's trial that in reference to Girly initiating divorce proceedings, Girly "made a choice with her own lawyer."  "They made a conscious decision, a conscious choice.  They made it, and I required justice for that." [Id., p. 43.] "[T]hey made a choice to decide to take my son from me, and then I made the choice to take her life from her.  It is as quick and as simple as that." [Id., p. 44.]

135.     In the Fall 2002, Henning proceeded to trial.  Diazien was Henning's primary witness.  Miller did not testify at Henning's trial and Diazien attempted to implicate Miller as the murderer of Girly Chew during his trial testimony.

136.     Diazien testified Henning played no role in the kidnapping or murder of Girly and that he had planted Henning's blood in Girly's apartment on September 9, 1999, to implicate Henning.  [Id., p. 45.] He asserted that while he planned the murder, he did not wish to know how or where the murder would take place.  Diazien's role, he claimed, was to plan the kidnapping and murder and clean up any forensic evidence left behind.  [Id., pp. 47-48.] According to Diazien, Bill Miller was to be the "muscle" behind Girly's actual murder. [Tr.#18, pp. 48, 49.] Henning was to provide part of Diazien's alibi, and Culp was to supply the other part of his alibi. [Id., p. 51.] Neither woman allegedly was to know anything about the kidnapping or murder.

137.     After more than two weeks of testimony and a week of deliberation, a jury found Henning guilty of first-degree felony murder, kidnapping, conspiracy to commit kidnapping, perjury (three counts), criminal solicitation, tampering with evidence (two counts), and conspiracy to commit tampering with the evidence.  Henning was found not guilty of the alternative count of first-degree murder, conspiracy to commit first-degree murder, perjury (one count), tampering with the evidence (four counts), and conspiracy to commit tampering with the evidence (four counts).  [Tr.# 24, pp. 15-16, Oct. 25, 2002 trial.] During the death penalty-qualified phase, the jury rejected the

34

prosecutor's request for capital punishment.  Thus, the jury's disposition was life imprisonment.
[Tr.#25, pp. 108-09, death penalty proceeding.]

## Analysis

## Exhaustion of Remedies

138.    As an initial matter, the Court need not further analyze the issue of exhaustion.  The
Court already made that determination, and the only claims addressed below are those that the Court
found were exhausted. [Doc. 21, pp. 23-24.]

## Deference to State Court Adjudications

139.    Henning's petition is analyzed under the Antiterrorism and Effective Death Penalty
Act ("AEDPA").  An application for writ of habeas corpus brought by an individual in custody
pursuant to a judgment of a state court shall not be granted with respect to any claim that was
adjudicated on the merits in State court proceedings unless the adjudication of the claim–(1) resulted
in a decision that was contrary to, or involved an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision
that was based on an unreasonable determination of the facts in light of the evidence presented in
the State court proceedings.  28 U.S.C. § 2254(d).

> A federal habeas court may issue the writ under the 'contrary to'
> clause if the state court applies a rule different from the governing
> law set forth in our cases, or if it decides a case differently than we
> have done on a set of materially indistinguishable facts.  The court
> may grant relief under the 'unreasonable application' clause if the
> state court correctly identifies the governing legal principle from our
> decisions but unreasonably applies it to the facts of the particular
> case.  The focus of the latter inquiry is on whether the state court's
> application of clearly established federal law is objectively
> unreasonable, and . . . an unreasonable application is different from
> an incorrect one.

Allen v. Mullin, 368 F.3d 1220, 1234 (10th Cir. 2004) (*citing* Bell v. Cone, 535 U.S. 685, 694 (2002)), *cert. denied*, 125 S.Ct. 1301 (2005).  This means that a federal court is precluded from granting habeas relief, except in the narrow circumstances described in § 2254(d), and that this Court must apply a presumption that the factual findings of the state court are correct unless the petitioner can rebut this presumption by clear and convincing evidence.  Smallwood v. Gibson, 191 F.3d 1257, 1264-65 (10th Cir. 1999), *cert. denied*, 531 U.S. 833 (2000).

140.   To justify federal habeas relief, the decision of the state court must not only have been erroneous, but also unreasonable.  Williams v. Taylor, 529 U.S. 362, 365, 376 (2000); Gipson v. Jordan, 376 F.3d 1193, 1196 (10th Cir. 2004), *cert. denied,* 546 U.S. 1030 (2005).  "Federal habeas courts do not sit to correct errors of fact or to relitigate state court trials.  Our jurisdiction is limited to ensuring that individuals are not imprisoned in violation of the Constitution."  Thompson v. Oklahoma, 202 F.3d 283 (Table, Text in Westlaw), No. 98-7158, 2000 WL 14404 at *6 (10th Cir. Jan. 10, 2000) (unpublished), *cert. denied,* 530 U.S. 1265 (2000).

141.   Before reaching Henning's habeas claims, the Court first determines whether the state court adjudicated the claims on the merits.  In a thorough opinion, the New Mexico Supreme Court, on direct appeal, addressed some of the same habeas claims Henning raises in this federal habeas proceeding.  Moreover, the Second Judicial District Court's denial of Henning's state habeas petition specifically addressed some, although not all, of Henning's many federal claims in more than a summary fashion.  Judge Murdoch stated that due to Henning's "lengthy and broadly rambling forum which offers discussion of every fact, non-fact, rumor and innuendo surrounding this case," the state court elected to choose several issues for discussion in its written decision "rather than chasing the rabbit down the hole to points unknown." [RP 1091.] In so doing, the state

court commented that it had made an "exhausting review of the record" and found Henning's arguments to be without merit. [Id.]

142.     Even if the state court's denial of Henning's state habeas petition was summary in fashion as to some of the claims, there is authority for the proposition that a court's summary dismissal of a habeas petition constitutes an adjudication on the merits.  Aycox v. Lytle, 196 F.3d 1174, 1177-78 (10th Cir. 1999) (affording deference under the AEDPA to state court's rejection of claim's merit, despite lack of any reasoning); Weeks v. Angelone, 176 F.3d 249, 259 (4th Cir. 1999), aff'd, 528 U.S. 225 (2000) (same).  See also Wright v. Angelone, 151 F.3d 151, 157 (4th Cir. 1998) (refusing to presume that a summary order indicated a cursory or haphazard review of a petitioner's claims).

143.     The Court concludes that the claims Henning raises in this federal habeas proceeding were adjudicated on the merits in state court and are, therefore, subject to review under the standard set forth in 28 U.S.C. § 2254(d).

## Federal Habeas Claims

### I. Alleged Denial of Due Process and Fair Trial Based on Trial Court's Abuse of Discretion

144.     As noted by the Tenth Circuit Court of Appeals in Fero v. Kerby, 39 F.3d 1462, 1478 (10th Cir. 1994), cert. denied, 515 U.S. 1122 (1995) the Supreme Court said clearly:

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness.

(citing In re Murchison, 349 U.S. 133, 136 (1955)).  The question raised by Henning's "due process claims" is whether any of the trial court's challenged actions or decisions so infused the trial with unfairness as to deny Henning due process of law.  See Lisenba v. People of State of California, 314 U.S. 219, 228 (1941), reh'g denied, 315 U.S. 825 (1942).  Whether there was a denial of a fair trial

must be judged on the totality of facts.  Gay v. Graham, 269 F.2d 482, 487 (10th Cir. 1959) (internal citation omitted).

145.    Based on all of the circumstances, as discussed more fully below, the Court concludes that Henning received a fair trial and was not denied due process of law.

**A.      $2.5 million cash-only bond** [Claim I, subclaim 1]:[21]

146.    Henning argues that Judge Murdoch's decision to set bond at $2.5 million "cash-only," "the largest bond set for anyone in the United States until Michael Jackson's trial," was excessive and violated Henning's constitutional rights.

147.    The Court rejects the argument because an excessive bail contention was mooted by Henning's conviction.  Murphy v. Hunt, 455 U.S. 478, 481 (1982).  In general, a case becomes moot "'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'"  Id., at 481-82 (*citing* United States Parole Comm'n v. Geraghty, 445 U.S. 388, 396 (1980), *quoting* Powell v. McCormack, 395 U.S. 486, 496 (1969)).  It is clear that under this general rule, Henning's claim that she was denied "reasonable" pretrial bail was moot after her conviction. In other words, even a favorable habeas decision would not entitle Henning to bail at this point.  *See* id.

148.    Moreover, a habeas petitioner claiming excessive bail must show constitutional prejudice and effect on the conviction.  White v. Wilson, 399 F.2d 596, 598 (9th Cir. 1968).  *See also* Qawi v. Vasquez, 995 F.2d 232, 1993 WL 179290, *1 (9th Cir. May 26, 1993) (habeas petitioner must show that any charging or bail setting errors resulted in an unconstitutional conviction)

---

[21]The Court enumerates the claims and subclaims through the use of alphabetical characters but adds in parenthesis the subclaim number used by Henning and used in the Court's earlier opinion addressing exhaustion issues.

(unpublished opinion).  Here, Henning did not show that her bail constituted excessive bail, under the circumstances of the case, or that it resulted in an unconstitutional conviction.

149.    For the above-stated reasons, the claim should be denied.

**B.      Speedy trial** [Claim I, subclaim 2]:

150.    Henning has a right "to a speedy and public trial" under the Sixth Amendment.  U.S. Const. Amend. VI.  In determining whether a defendant was deprived of her constitutional right to a speedy trial under the Sixth Amendment, a court should consider and balance the following factors:  (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of her right to a speedy trial; and (4) prejudice to the defendant.  Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182 (1972); United States v. Dirden, 38 F.3d 1131, 1137 (10th Cir. 1994).  The threshold inquiry is the length of delay.  The remaining factors are examined only if the length of delay is found "presumptively prejudicial."  Dirden, 38 F.3d at 1137.

151.    Henning's trial occurred slightly over a year from the date of her arraignment in July 2001, after the second indictment.  The Tenth Circuit "ha[s] not drawn a bright line beyond which pretrial delay will trigger Barker analysis."  Id.  In Dirden, a seven or eight month delay between arraignment and trial was not considered "presumptively prejudicial."  Id. at 1138.  *See* United States v. Kalady, 941 F.2d 1090, 1095-96 (10th Cir. 1991) (eight month delay is nonprejudicial); United States v. Bagster, 915 F.2d 607, 611 (10th Cir. 1990) (delay of thirty months did not trigger Barker analysis).  *See also* United States v. Lindsey, 47 F.3d 440, 443 (D.C. Cir. 1995) (16 month period between arrest and trial on drug trafficking charges was not extraordinary), *vacated on other grounds by* Robinson v. United States, 516 U.S. 1023, 116 S.Ct. 665 (1995); *but see* Perez v. Sullivan, 793 F.2d 249, 255 (10th Cir.) (fifteen month delay was "presumptively prejudicial"), *cert. denied*, 479 U.S. 936, 107 S.Ct. 413 (1986).  In Doggett v. United States, 505 U.S. 647, 652 n. 1,

112 S.Ct. 2686 (1992), the United States Supreme Court recognized that lower courts generally have found post-accusation delay "presumptively prejudicial" when the delay approaches one year. *See* United States v. Batie, 433 F.3d 1287, 1290 (10th Cir.) (pretrial delay approaching one year sufficient to trigger Barker analysis), *cert. denied*, 548 U.S. 908 (2006).

152.    Progress in this death penalty-qualified case was slow, but there was voluminous DNA and scientific evidence.  Many substantive motions were filed by both parties.  In addition, Henning joined in many of the motions filed by Diazien.  On two different occasions, competency exams for Henning were ordered. [*See procedural history, supra.*] Defense counsel prompted one of those exams but defense counsel did not withdraw the motion for competency evaluation until August 2002, the eve of trial. [RP 204, first indictment.]

153.    In addition, Henning was represented by a number of different attorneys, each of whom had to "get up to speed" on a case that involved tens of thousands of pages of evidence and pleadings.  As late as June 2001, Henning sought appointment of new counsel because she was displeased with the performance of Attorney Bustamante.  Moreover, in response to objections Henning raised, in July 2001, the State issued a Nolle Prosequi as to the entire first indictment.

154.    The parties both filed motions for continuance of the trial dates, and neither party opposed the requests for extensions of time. [*See, e.g.,* RP 83, 167, 325, first indictment.] On October 18, 2001, Attorney Gary Mitchell, who entered an appearance in August 2001, filed a motion to reset the pretrial conference and trial setting of January 2002 because of the extensive discovery he needed to review.  [RP 58, second indictment.] Attorney Mitchell filed a similar motion in December 2001. [RP 70, second indictment.]  Diazien pled guilty in January 2002, which also impacted preparation of the Henning trial.  At that time, both parties agreed to an extension of time in which to try the case based on Diazien's plea. [RP 79, second indictment.]

155.    In view of the extensive preparation required for this death penalty-eligible trial and the delays prompted by both parties, the Court finds the delay equally attributable to both parties.

156.    The Court acknowledges that Henning first referred to her speedy trial rights as early as December 1, 2000, in a motion for sanctions. [RP 207, first indictment.] At that time, a little over a year had passed since Henning was arraigned on the first indictment.  Henning's December 1, 2000 motion [RP 212, first indictment] did not seek dismissal based on violations of her right to a speedy trial.  Instead, she argued that the State's delay in producing discovery was impacting her right to a fair and speedy trial. [Id.] The Court observes that discovery in this complex death penalty-qualified case was still being developed as of December 2000.  As noted by the State, thousands of pages of discovery were being produced, reports in excess of several thousand pages were produced, and over 400 potential trial witnesses were identified.  Moreover, Henning's assertion in November 2000 that she was incapacitated for trial (even though she may have disputed this matter with her attorney) contradicted her allegation in December 2000 that her speedy trial rights were violated. In addition, Henning never filed a specific motion to dismiss based on speedy trial violations, nor did she raise the matter again before or during her actual trial in 2002.  The Court concludes that this factor weighs in favor of the State.

157.    The Court also recognizes that Henning was incarcerated for about three years before her case went to trial and acknowledges her allegation of "extreme conditions of confinement." However, she essentially acquiesced to the requests to delay the trial, or prompted delays in the trial by requesting a competency exam and new attorneys.  Thus, while Henning may have been prejudiced by having to await trial in prison, the prejudice was offset by the time-served credit she received.  This factor weighs in favor of the State.

41

158.    Under the circumstances of this case, the Court concludes there was no violation of Henning's Sixth Amendment right to a speedy trial.  Thus, the claim should be denied.

**C.    Motion ignored by Judge Knowles** [Claim I, subclaim 3]:

159.    Henning alleges that Judge Knowles ignored a motion requesting that the State be sanctioned for lying to the Court "in regards to erroneous evidence used during the first grand jury to secure an indictment for murder one and a death-qualified trial." [Doc. 1.] Henning refers to a motion to compel, filed October 12, 2000. [RP 160, first indictment.]

160.    Henning's motion sought discovery of evidence, testing, or results presented to the first grand jury.  Alternatively, she requested dismissal of the indictment returned against her as having been obtained on false representations to the grand jury. [RP 161, first indictment.] Judge Knowles set the motion for hearing on October 31, 2000. [RP 165, first indictment.]

161.    The State Court's docket sheet indicates Judge Knowles held a hearing on October 31, 2000, although there is no transcript of the hearing for this Court to review. [RP, p. 15, "case history," first indictment.] By October 16, 2000, both parties stipulated to a petition for extension of the trial date, based on extensive discovery associated with Henning's case and the companion case, and because evidentiary matters (both forensic and otherwise) were still being developed, both within and outside the United States. [RP 168, first indictment.] A delay also occurred because Diazien's attorney became ill during this time frame and eventually died. [RP 168.] Henning did not object to this extension. Moreover, Henning continued to file motions to compel, and the State continued to produce evidence.  On August 12, 2002, Judge Brennan held a motion hearing during which Henning's motions to compel were heard. [Tr.#3.]

162.    The Court finds no support for Henning's argument that Judge Knowles committed error in failing to address a motion to compel.  In addition, even if there was error, it was harmless.

In this case, a grand jury convened a second time and heard evidence again as to the charges brought against Henning.  Any irregularities alleged in the first indictment were cured by the superseding indictment.  *See* Lugo v. United States, 2008 WL 5191684, *7 (E.D.N.Y.,Dec. 11, 2008) (technical errors in indictments may be cured by the weight of evidence presented at trial, the jury instructions, and the verdict).  Thus, any alleged error committed by Judge Knowles, and the Court finds none, was harmless.

163.    Accordingly, this claim should be denied.

**D.    Change of venue, defamatory remark, circus-like atmosphere** [Claim I, Subclaims 6, 7, 9, 10]:

164.    The right to a jury trial guarantees the criminal defendant "a fair trial by a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961).  The Constitution, however, does not guarantee a panel of jurors without any previous knowledge of the issues involved, or even jurors without any previous opinions regarding the matter.  It "is sufficient if the juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court."  Id., at 723 (internal citation omitted).

165.    Change of venue lies within the sound discretion of the state court trial judge.  The trial judge is in the best position to observe the demeanor of prospective jurors and assess whether a juror can disregard any opinions based on pretrial publicity.  Patton v. Yount, 467 U.S. 1025, 1038-39 (1984).  *See also* United States v. Williams, 897 F.2d 1034, 1036-37 (10th Cir. 1990), *cert. denied*, 500 U.S. 937 (1991).

166.    Henning argues that the trial judge erred in not granting a change of venue requested by defense due to extensive news coverage of the case before trial.  She further alleges that the State made unsubstantiated allegations that Henning was a "homewrecker, hitwoman, Ninja assassin and

cannibal" in order to taint the jury pool.[22]  According to Henning, the trial judge showed his bias towards her.

167.    There was extensive pretrial publicity concerning Girly Chew's disappearance and murder in the three years preceding Henning's trial.  However, Henning did not demonstrate "the actual existence of such an opinion in the mind (i.e., of guilt) of the juror as will raise the presumption of partiality."  *See* Murphy v. Florida, 421 U.S. 794, 800 (1975) (internal quotation omitted).  Henning identifies no actual hostility or impartiality by the jurors.

168.    Moreover, nothing in the case record indicates that Defendant filed a motion to change venue.  During the first day of jury selection, Attorney Mitchell stated to the Court that there was a lengthy article on the case in the local newspaper that day.  He further indicated that "I'm not moving for a change of venue at this time, but if jurors have read this article, frankly, it's longer than my opening statement would be in this case." [Tr.#5, pp. 6-7, September 23, 2002 jury selection.] The Court marked the newspaper article as exhibit A should the defense needed it later for venue or publicity questions.[23] [Id., p. 7.]

169.    The Court carefully examined four volumes of transcripts during jury selection where counsel and the state court diligently asked each prospective juror about any knowledge he or she had regarding media coverage of this case and whether that news coverage would affect his or her independent, fair judgment in the case.  The Court did not locate any statements by prospective

---

[22]Newspaper articles regarding the case and investigation were discussed at trial in reference to the fact that Miller had been keeping copies of certain articles.  However, no newspaper articles were admitted into evidence. [Tr.#13, p. 39.]

[23]In Henning's statement of issues on appeal, prepared by Mitchell, one of the points raised was the trial court's alleged error in failing to change venue, "particularly after voir dire of the jury when a local Albuquerque newspaper published an extensive article regarding 'the other Linda.'  This issue was raised during trial by a motion to change venue brought by the defense and denied." [Doc. 12, Ex. D., p. 7.] The Court did not locate the request for a change of venue in the lengthy trial transcripts, but even if true, the Court finds no error in the state court's possible denial of a request to change venue.

jurors concerning the allegations Henning states she observed in news coverage.  Nor did Henning

present any of those articles as exhibits to her habeas petition.  In addition, the transcripts offer no

support for the claim that the state court judge exhibited bias against Henning during jury selection,

or at any other point in the trial.  To the contrary, Judge Brennan carefully and exhaustively asked

each juror about prior knowledge of the case and whether the juror could decide the case fairly,

without reference to news coverage.  Judge Brennan repeatedly cautioned the jurors during trial to

ignore any media attention.  The Court also notes that Attorney Mitchell extended "thanks" to the

trial judge for the professional manner in which he conducted court proceedings and for the fairness

of the court process. [Tr.#27, p. 13.]

170.    Henning also argues that Judge Brennan made a defamatory remark at trial when he

said "it was obvious defendant is mental ill."  Henning contends that no such diagnosis existed and

the alleged remark demonstrated the judge's bias against her.

171.    In addition, Henning asserts that Brennan showed bias against her when he told the

news media that Henning should take a plea bargain to save the State hundreds of thousands of

dollars.  Henning argues that there was no plea bargain option available then and that television

reports and newspapers published the trial judge's comments, which tainted the jury pool.  While

Henning claims that these statements were made "before trial and before trial judge Brennan

presided over any hearing," she supplies no evidence in the form of newspaper articles or otherwise

to show that Judge Brennan made these statements or that such remarks were carried by the media.

Nothing of record supports these claims.  In addition, the Court already concluded, as discussed

*supra*, that no evidence exists to demonstrate the jury pool was tainted or biased.

172.    Moreover, after an exhaustive examination of the transcripts of the jury trial, death

penalty-qualified proceeding and sentencing hearings, the Court found no instances where the state

court judge remarked on Henning's mental health, with the exception described below.  Henning

did not provide the Court with any specific reference as to when the alleged remark was made.

173.    At the first sentencing proceeding, held October 31, 2002, Judge Brennan determined

that he would not sentence Henning on that date.  Instead, he noted that one of his options was to

request a psychological evaluation of Henning.  He further stated:

> I do think that there has [sic] been issues about [Henning's] mental
> health that I've inquired about during the course of the trial.  I've
> been convinced that although she may have some problems, that
> she's not incompetent, but I do think I would like to find out more
> about what the nature of those problems are in terms of under-
> standing her in imposing an appropriate sentence.

[Tr.#27, p. 15, October 31, 2002 hearing.]  This statement was true.  Indeed, Henning's own attorney

questioned her competency and sought a competency hearing.

174.    There is no record of Judge Brennan saying Henning was "mentally ill" nor did he

make the above quoted statement in front of the jury or before Henning was convicted.  To the

extent that Judge Brennan discussed Henning's mental health with counsel during trial, such

discussions did not occur before the jury and could not have influenced the jury.  There simply is

no evidence in the record of bias by Judge Brennan.

175.    In addition, Henning argues she did not receive a fair trial because Judge Brennan

allowed a "circus-like" atmosphere during the trial, including "sensational coverage by Court TV

and the media frenzy."

176.    The Court examined the trial transcripts thoroughly from pretrial motion hearings

through post-trial motion hearings and the sentencing proceeding.  The claim of a "circus-like"

atmosphere is unsupported by anything in the transcript.  At one point, Judge Brennan advised the

impaneled jurors that Court TV and the local media would be present in the courtroom but that the

46

media could not photograph the jurors. [Tr.#8, p. 8, Sept. 26, 2002.]  Indeed, the New Mexico Supreme Court imposes strict requirements concerning use of cameras in the court, including limitations on the number (one) and requiring media pooling footage.  Rule 23-107 NMRA.

177.    This is not a case where the trial transcripts reflect that "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings . . . ." Nor did the trial transcripts reveal that the proceedings in this case were "entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob."  *See* Murphy, 421 U.S. at 799 (discussing when a presumption of prejudice might be found due to pretrial publicity).

178.    Similarly, Henning did not demonstrate that "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial . . ."  *See* Sheppard v. Maxwell, 384 U.S. 333, 353-54 (1966) (court found that the trial was corrupted by "massive, pervasive and prejudicial publicity").

179.    Under the circumstances of this case, Henning failed to demonstrate evidence of a media frenzy or circus atmosphere at trial, such that she did not receive a fair trial.  Moreover, Henning's claims are refuted by her own attorney's compliments to the court for the dignified and professional way the judge conducted the trial.  [Tr.#27, p. 13.]  In addition, Henning presented no evidence of an "inflammatory atmosphere within the community or courtroom, by specific statements of jurors, or by the difficulty with which an impartial panel was selected."  *See* Brecheen v. Reynolds, 41 F.3d 1343, 1351 (10th Cir. 1994) (discussing standards regarding juror impartiality and pervasive media influence), *cert. denied,* 515 U.S. 1135 (1995).

180.    Therefore, the claims should be dismissed.

E.     **Court's exclusion and admission of evidence** [Claim I, subclaims 11, 12, 14]:

181.     Henning claims that Judge Brennan erred in excluding possibly exculpatory evidence in the form of an Allied Van Lines' inventory list that would have shown that a wet vacuum (or steam cleaner) was not in the State of New Mexico when Girly Chew disappeared.  According to Henning, Judge Brennan also erred in admitting certain trial evidence, including an "altered letter re-written by the prosecution," and the previously misplaced audiotape recording of a conversation between Miller and Henning.

182.     As a general rule, federal courts may not review a trial court's evidentiary rulings. Crane v. Kentucky, 476 U.S. 683, 689 (1986) ("We acknowledge . . . our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts.").  The Tenth Circuit Court of Appeals observed that it gives considerable deference to state court evidentiary rulings, which "may not provide habeas corpus relief . . . unless [those rulings] rendered the trial so fundamentally unfair that a denial of constitutional rights results."  Duckett v. Mullin, 306 F.3d 982, 999 (10th Cir. 2002) (internal quotations omitted), *cert. denied,* 538 U.S. 1004 (2003).  *See also* Smallwood, 191 F.3d at 1277 (applying the same standard to review a state court's decision to admit evidence of prior bad acts); Gilson v. Sirmons, 520 F.3d 1196, 1242 (10th Cir. 2008) (discussing federal court's role in reviewing state court's evidentiary rulings), *cert. denied*, 129 S.Ct. 1327 (2009).

183.     Here, evidence was admitted showing that Diazien's household furniture and items had been picked up by a moving crew on September 8, 1999. [Tr.#12, p. 125.] Diazien testified that he made Girly's carpet look like it had been steam cleaned but that he had not used a steam cleaner. [Tr.#18, pp. 107-08.] He further testified that the steam cleaner he owned was already on the moving van and that it could not have been a part of the crime clean-up on September 9, 1999. [Id., p. 108,

48

115.] Diazien stated he did not travel with the steam cleaner in his vehicle on September 10, 1999, because it would not have fit. [Id., p. 112.] Upon executing a search warrant at Diazien's residence in South Carolina, after September 9, 1999, a carpet steam cleaner was located. [Id., p. 79.] Based on a hearsay objection that the court sustained, the Allied Van Lines inventory, showing the steam cleaner listed, was not admitted at trial. [Id., p. 114.] Notwithstanding the failure to admit the inventory list, Defendant adequately presented the argument that the steam cleaner was already on the moving van by the time Girly disappeared.  The State argued that the steam cleaner could have been placed on the moving van, inventoried, and removed from the van before the van left.  [Id., p. 114.] The jury was left to draw appropriate inferences.

184.    The State played the audiotape of the Miller-Henning conversation at trial and the tape was admitted, without objection. [Tr.#13, pp. 12-13.] The defense did not argue that the tape was altered or edited nor present evidence to this effect.

185.    With respect to the letter that Henning claims was altered or re-written by the prosecution and erroneously admitted into evidence at trial, Henning is incorrect.  The Court did not allow admission of the demonstrative exhibit containing the State's proposed written version of how the letter at issue should be punctuated and interpreted.  Instead, the Court allowed admission of Henning's original letter, as written, and then permitted both parties to argue the different interpretations that might be attributed to the letter. [Tr. #14, pp. 43-48, 53-54; Tr.#15, pp. 50-53, 55-60.] Argument by both parties was lengthy and vigorous.

186.    Henning did not show that any of these evidentiary rulings rendered her trial so fundamentally unfair as to violate due process.  Accordingly, the claims should be denied.

F.      **Judge Brennan** [Claim I, subclaim 13.]

187.    Henning argues that Judge Brennan was using mind or mood altering drugs during the time he oversaw Henning's death penalty trial. She asserts that one year after her trial, Judge Brennan was arrested for drunk driving and possession of a controlled substance. Henning attached several newspaper articles concerning Judge Brennan's arrest in 2004. One article, dated May 31, 2004, stated that Judge Brennan had been arrested on drug charges at that time.

188.    Judge Brennan's arrest occurred well over a year after Henning's trial in October 2002. Nothing in the trial transcripts indicates that Judge Brennan was "under the influence" during Henning's trial, nor do the media reports state that Judge Brennan was using "mind-altering" drugs at that time. Henning fails to show how the trial judge's off-the-bench activities one year after her trial impacted her trial or how her trial was so fundamentally unfair that she was denied due process.

189.    Accordingly, this claim should be dismissed.

190.    The Court concludes Henning did not demonstrate that any of the challenged trial court's actions or decisions so infused the trial with unfairness as to deny Henning due process of law. In addition, there was no showing that any of the above-described state court's decisions were contrary to or involved an unreasonable application of clearly established federal law as set forth by the Supreme Court. Similarly, Henning did not demonstrate that any of the state court decisions were based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Therefore, the Court recommends that all of the claims alleging abuse of discretion and due process violations be denied and dismissed.

50

## II. <u>Alleged Ineffective Assistance of Counsel</u>

191.    The United States Supreme Court's decision in <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984) governs the inquiry of whether an attorney's performance was ineffective. In order to establish a claim of ineffective assistance of counsel, Henning must show both that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that she was prejudiced because counsel's errors rendered the outcome of the state court's proceedings unreliable. <u>Id.</u> In applying the test of whether an attorney's performance was deficient and fell below an objective standard of reasonableness, the Tenth Circuit advises that "we give considerable deference to an attorney's strategic decisions and 'recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" <u>Bullock v. Carver</u>, 297 F.3d 1036, 1044 (10th Cir.) (internal citation omitted), *cert. denied*, 537 U.S. 1093 (2002). In order to be found constitutionally ineffective, trial counsel's performance must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy. <u>Hoxsie v. Kerby</u>, 108 F.3d 1239, 1246 (10th Cir.), *cert. denied,* 522 U.S. 844 (1997).

192.    The question under Strickland is not whether counsel could have done more or even better, but whether counsel's actions or decisions were "[objectively unreasonable] in all the circumstances, applying a heavy measure of deference to counsel's judgments." <u>Strickland</u>, 466 U.S. at 691. In other words, even if Henning may not have received "perfect legal representation" at every step of the proceeding, she is not entitled to perfect representation. <u>Washington v. Watkins</u>, 655 F.2d 1346, 1357 (5th Cir. 1981), *cert. denied*, 456 U.S. 949 (1982). *See also* <u>United States v. Rhoads</u>, 617 F.2d 1313, 1319 (8th Cir. 1980) (not entitled to representation that results in an acquittal or "best possible" representation); <u>Martinez v. U.S.</u>, 2008 WL 2329171, *5 (D. Utah June 3, 2008)

(unpublished opinion).  The Court does not indulge in the "distorting effects of hindsight."  <u>Strickland</u>, 466 U.S. at 689.

193.    Henning brings four broad claims of ineffective assistance of counsel, broken down into subsections and many subclaims that the Court allowed to proceed after its analysis of exhaustion.  The first broad category is Henning's assertion that she received ineffective assistance of counsel that "contributed to the jury's finding of a conflicted verdict." (Claim II, Section I)

194.    The Court undertook an exhaustive review of all of the record proper, transcripts, pleadings, and exhibits.  With respect to many of the ineffective assistance of counsel claims, the Court determines that Henning did not demonstrate constitutionally defective performance by trial counsel or prejudice resulting from counsel's errors such that the  outcome of the state court's proceedings was rendered unreliable.  Indeed, many of Henning's ineffective assistance of counsel claims focus on defense counsel's strategic choices.  Such claims are rarely successful and are not successful in this case.  <i>See</i> <u>Strickland</u>, 466 U.S. at 689 (court does not indulge hindsight in evaluating counsel's effectiveness, but will apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and sound trial strategy).

195.    For purposes of clarity, the Court lists each claim below, but provides little additional discussion as to certain claims either because no further analysis is required or because the claims are analyzed elsewhere in the Court's recommendation.[24] Following that list of claims, the Court provides analysis of the remaining ineffective assistance of counsel claims in this section.

---

[24]Many of Henning's claims are duplicative or contain portions of claims that are included in other claims.

Claim II, Section I, Ineffective Assistance of Counsel Claims, dismissed with little
or no analysis

196. **Defense counsel denied the defendant the right to participate in her own defense.
Despite repeated requests by defendant to defense counsel for "discovery" "no
more than 5,000 pages or less (out of nearly 100,000 according to prosecution)"
were provided.** [Subclaim 4] The facts as alleged do not support a claim of ineffective
assistance of counsel.

197. **Defense Attorney Cordle violated confidentiality between himself and Henning
by disclosing the location of a sword hidden in Henning's garage. Cordle also
destroyed photos of an exculpatory nature which revealed the existence of a
multitude of painting dropcloths of all colors and sizes throughout Henning's
home. Cordle embezzled over $30,000 from Henning's accounts and the sale of
her home. Cordle left the State of New Mexico with Henning's funds and gave up
his law license. Trial counsel failed to disclose these matters to jury.** [Subclaims
6, 54, 55, 56] No such evidence was presented. The facts as alleged do not support a
claim of ineffective assistance of counsel.

198. **Defense counsel Trienah Gorman destroyed pages of notes given to her by
defendant detailing case, co-defendants and extreme conditions of confinement
at county jail.** [Subclaim 8] No such evidence was presented. The facts as alleged
do not support a claim of ineffective assistance of counsel.

199. **Defense counsel Bustamante failed to attend a number of hearings either by
himself or with defendant in Judge Frank Allen Jr.'s courtroom regarding this
case. To date, defendant has no knowledge of what transpired in those hearings
attended by other co-defendants. Bustamante attempted to keep $50.00 sent to
him by Henning's mother for her.** [Subclaim 9] No such evidence was presented.
The facts as alleged do not support a claim of ineffective assistance of counsel.

200. **Defense counsel throughout the entire case actively represented conflicting
interests and loyalties; the primary concern was to save the State money. Defense
attorney Mitchell's efforts were put forth to protect his own "self-interest" and
that of his main client, the State, which regularly provided Mitchell with most of
his high-profile cases.** [Subclaims 11, 25] No such evidence was presented. The
facts as alleged do not support a claim of ineffective assistance of counsel.

201. **Defense counsel failed to request the recusal of the trial judge when judge
exhibited prejudice and bias in a public forum. Judge Brennan publicly stated he
believed Henning was guilty and made a public request that Henning take a plea
bargain to save the State money. Judge Brennan was poisoning the minds of the
jury pool.** [Subclaim 23] No such evidence was presented. The facts as alleged do not
support a claim of ineffective assistance of counsel.

202. **Defense attorney gave the appearance that he was only concerned with his personal interests in the news media coverage of the trial. He allegedly told Court TV that "they owed him one" for the direct examination of Diazien. Supposedly, defense counsel dined with the Court TV producer.** [Subclaim 31] No such evidence was presented. The facts as alleged do not support a claim of ineffective assistance of counsel.

203. **Defense failed to present expert witness who would have testified about the numerous errors APD made in the collection, handling and preservation of evidence and APD's violation of its own policies and procedures.** [Subclaim 36] This claim is made repeatedly and discussed elsewhere in the recommendation. The facts as alleged do not support a claim of ineffective assistance of counsel.

204. **Defense counsel failed to object to trial judge calling Henning "mentally ill."** [Subclaim 39] No such evidence was presented. The facts as alleged do not support a claim of ineffective assistance of counsel.

205. **Defense counsel failed to impeach Amy Smuts' expert testimony with Smuts' alleged first letter to expert Dickey and prosecutor Spiers, in which Smuts detailed the integrity of the chain of custody from Chew's mother in Malaysia.** [Subclaim 46] This claim is made repeatedly and discussed elsewhere in the recommendation. The facts as alleged do not support a claim of ineffective assistance of counsel.

206. **Defense failed to submit Det. Mike Fox's hand-written "chronological evidence to lab log," which discredited APD detectives' grand jury testimonies as to when evidence was recovered and delivered to the APD crime lab.** [Subclaim 48] This claim is discussed elsewhere in the recommendation. Moreover, no such evidence was presented. The facts as alleged do not support a claim of ineffective assistance of counsel.

207. **Defense counsel requested an evidentiary hearing after the trial regarding new evidence concerning testimony by karate instructor Lucero as to his observation of Miller in the parking lot outside the karate studio. This information could have been discovered earlier in the case, rather than after trial.** [Subclaim 50] This claim is discussed elsewhere in the recommendation. The fact as alleged do not support a claim of ineffective assistance of counsel.

208. As stated previously, the Court recommends dismissal of the above-stated claims, either because the Court discussed some portions of those claims above, or because Henning does not demonstrate constitutionally defective performance on the part of counsel, or prejudice. Many of the above-mentioned claims do not refer to the jury trial and instead concern alleged performance of

previous attorneys of Henning or proceedings that predated the trial.  With respect to many of the claims, Henning provides only unsubstantiated allegations.  In some cases, the claims are discussed in other portions of the recommendation.

Claim II, Section I, Ineffective Assistance of Counsel Claims, dismissed with analysis

209.    **Judge Knowles dismissed all evidence against co-defendant Miller despite "hard-evidence linking Miller to both victim's apt. and crime scene."** [Subclaim 1a]

210.    This is not a viable ineffective assistance of counsel claim.  It also does not pertain to Henning's trial.  Indeed, it may relate to the grand jury's failure to indict Miller during the second or third grand jury proceeding.  The claim is not a cognizable § 2254 claim and should be dismissed.

211.    **Defense counsel allowed the prosecution to prevail on a "thin" case because the defense failed to subject the State's case to a thorough adversarial review. Defense counsel failed to interview witnesses before trial in order to prepare a strategy to impeach witnesses.** [Subclaims 2, 32]

212.    The Court disagrees.  Based on a thorough review of the record, the prosecution's case was not "thin."  This is discussed both above and in more depth below in connection with the sufficiency of evidence claims raised by Henning.  In addition, defense counsel vigorously subjected the State's case to a thorough adversarial review.  Defense counsel conducted extensive cross-examinations of the State's key witnesses and raised many objections, a significant number of which were sustained by the Court.  Based on the trial transcript, defense attorneys were both very prepared in their cross-examination of State witnesses and did a capable job of attempting to impeach the witnesses.  Henning fails to demonstrate constitutional error by counsel, or prejudice.

213.    **A conflict of interest existed when Attorney Mitchell was assigned to represent inmate Harry Doyle Monk in April 1999 for Doyle's murder case; "[]subsequently Mitchell represented Monk in his deposition against the defendant and Mitchell later was appointed as defendant's defense [sic].  Mitchell should have recused himself."** (Subclaim 5)

214.    There is no evidence in the trial record to support these allegations.  Even if considered true, there is no evidence that Henning filed a motion to withdraw counsel for an alleged conflict. Moreover, the Court does not consider this claim to assert "presumed" ineffective assistance of counsel based on an actual conflict.  *See* <u>Moore v. United States</u>, 950 F.2d 656, 660 (10th Cir. 1991) (a defendant is entitled to a presumption of prejudice on an ineffective assistance of counsel claim if she demonstrates the attorney actively represented conflicting interests and that an actual conflict of interest adversely affected the lawyer's performance).  Even if Mitchell represented conflicting interests at some point, Henning did not show that an actual conflict of interest adversely affected Mitchell's performance at the time of her trial.  In addition, Monk did not testify at Henning's trial. Henning fails to demonstrate constitutional error by counsel, or prejudice.

215.    **Defense counsel Trienah Gorman threatened defendant to take a "plea bargain" from the State.  When defendant refused, counsel filed a motion of incompetency to stand trial.** [Subclaim 7]

216.    The Court located no evidence to show that Henning was threatened to take a "plea bargain" or that any plea agreement was offered to her.  Moreover, the competency motion was eventually withdrawn and Henning proceeded to trial, having been found competent to stand trial. Henning fails to demonstrate constitutional error by counsel, or prejudice.

217.    **All defense counselors failed to perform due diligence in the preparation of death-qualified trial defense for defendant.  Defense counsel failed to preview the evidence before trial.  By not previewing the evidence or discussing it with Henning, the defense could not impeach the evidence presented at the <u>Ogden</u> hearing.** [Subclaims 10, 34]

218.    The only attorneys whose performance appears pertinent to this claim, are Mitchell and Baca, who represented Henning at the <u>Ogden</u> hearing, trial, and death penalty-qualified proceeding. Defense counsel filed no less than 23 pre-trial motions on behalf of Henning, including a motion for pre-trial judicial review of sufficiency of evidence to proceed with aggravating circumstance at trial

on the merits, motion to dismiss and bar the death penalty, motion in limine to limit evidence of aggravating circumstances, motion for discovery of witnesses the State intended to call at the death penalty sentencing stage, motion to instruct jury regarding definition of a life sentence in New Mexico, and motion to restrict the scope of the State's penalty phase arguments. [RP 136-229, second indictment.] Counsel ably presented a defense as is evidenced by the fact that Henning did not receive the death penalty. Thus, even if Henning could demonstrate constitutionally defective performance by counsel, there was no prejudice.

219.    In addition, defense counsel subjected the State's witnesses to thorough cross-examination during the Ogden hearing. The state trial judge noted that the "probable cause" standard was quite low and allowed the case to proceed as a death-qualified trial. The Court does not find any constitutionally defective performance by defense counsel, or prejudice.

220.    **Defense counsel presented only two defense witnesses, both of whom were hostile to Henning and both of whom Henning rejected. Defense counsel failed to secure adequate funds for Henning's defense, notwithstanding the fact that her trial was the largest DNA case in New Mexico history. Defense counsel failed to move to continue the trial date in order to acquire expert witnesses, DNA experts, geneticists, blood spatter experts, etc. to impeach the State's experts. Over Henning's objections, defense counsel disclosed to Henning a day or two before trial the defense strategy of using a false statement made by Diazien as her "sole defense." Defense failed to adequately impeach State DNA witness as to blood found on panties.** [Subclaims 12, 13, 14, 26, 28, 49, 53]

221.    Henning argues that defense counsel should have presented more witnesses favorable to her defense. However, she fails to identify the witnesses who would have given favorable testimony on her behalf or what testimony they would have provided. "[T]he decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney." Boyle v. McKune, 544 F.3d 1132, 1139 (10th Cir. 2008), *cert. denied*, 129 S.Ct. 1630 (2009).

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and

> strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690-91.  Based on a thorough review of the record and transcripts, the Court is convinced that trial counsel conducted a reasonable investigation in this case.  Thus, the Court will not second guess counsel's strategic choices.

222.    Henning's argument that trial counsel should have obtained funds to hire appropriate DNA and blood spatter experts is more troubling to some degree.  The prosecution relied heavily on DNA and trace evidence and utilized a number of different expert witnesses who provided compelling testimony linking Henning to Girly's apartment.

223.    However, it was a strategic decision by Henning's attorneys to not challenge the DNA evidence and instead, to rely on Diazien's testimony that he planted Henning's blood at Girly Chew's apartment.[25]  Thus, consistent with the defense theory, there was no need to challenge the DNA evidence as Attorney Mitchell urged the jury to determine that Diazien planted Henning's blood at Girly's apartment.  While tactical decisions may always be second guessed, it is clear that the decision itself was legitimate trial strategy.  Henning did not overcome the presumption that defense counsel's strategic choices are considered sound trial strategy.

---

[25]Diazien testified that he intended to plant a female's blood in Girly's apartment after he saw evidence of blood left behind, that he assumed was Girly's.  Since Diazien was certain that the police would target him when they discovered evidence of blood in Girly's apartment, he wished to divert police attention from him by planting blood from a female there.  The first vial of female blood which he had taken from his refrigerator broke in his pocket.  According to Diazien, it was "unfortunate," but the only other vial of female blood he had in his refrigerator was Henning's.  He nonetheless used that vial to divert attention from himself and towards a female.  Thus, Attorney Mitchell's strategy was to show that the presence of Henning's blood at Girly's home could be explained by Diazien's testimony that he planted it. [Tr.#18, pp. 98, 104; Tr.#19, pp. 105-06.]

58

224.    In addition, Henning does not provide any specific argument as to how the State's experts should have been challenged, other than to say the police collection and handling techniques were sloppy or inadequate.  Vague and conclusory arguments are insufficient.  Henning must identify the specific deficiencies of DNA evidence that should have been challenged.  *See* <u>Martinez</u>, 13 F. App'x at 876-77 (habeas petitioner must detail deficiencies of DNA evidence, demonstrate how the deficiencies are relevant to his case and show how they would have made a difference in the outcome of his trial).  Second, Henning does not expressly contend that her blood or hair was not at Girly Chew's apartment.  Under the circumstances of this case, hiring DNA experts or challenging the DNA evidence might have actually undermined Henning's defense that Henning's blood, while present in the apartment, had been planted by Diazien.

225.    Finally, this issue was expressly addressed and rejected on direct appeal and by the state district court.  The federal courts have a "secondary and limited" role in reviewing state court rulings through a habeas petition. <u>Castro v. Ward</u>, 138 F.3d 810, 815 (10th Cir.), *cert. denied*, 525 U.S. 971 (1998).  Here, there is no showing that the state courts' decisions were contrary to or involved an unreasonable application of clearly established federal law, or that they were based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. § 2254(d).

226.    **Henning claims that defense counsel was well aware that Diazien's testimony would not be credible after hearing his performance at Miller's grand jury, when the grand jury failed to charge Miller with any of the harsher charges.** [Subclaim 29]

227.    Again, the choice to call Diazien as a defense witness was a strategic choice by counsel that the Court will not second guess or examine with the benefit of hindsight.  While Henning argues that the defense strategy, relying on Diazien's testimony, involved a lie, she fails to state how the

defense could have challenged the DNA evidence found in Girly's apartment that linked Henning to the crime, and still argue that Diazien planted the evidence.  Thus, defense counsel's strategy was viable, even if not successful.

228.    Moreover, the State had an indictment against Miller including a serious charge of conspiracy.  The prosecution returned to the grand jury, relying on Diazien's testimony, in an attempt to obtain an indictment for first degree murder.  Thus, the State apparently believed Diazien's testimony could be credible in implicating Miller, even though that strategy, at that point, was unsuccessful.

229.    After considering Diazien's performance at Miller's grand jury proceeding, defense counsel could reasonably believe that while Diazien was not helpful in the Miller grand jury proceeding, he might be helpful at Henning's trial.

230.    Henning did not demonstrate constitutionally ineffective performance by counsel nor did she show prejudice.

231.    **Defense counsel undermined Henning's defense strategy by portraying Diazien as a "con man" to the jury.  Thus, defense counsel poisoned the minds of jurors as to its primary witness.** [Subclaim 30]

232.    Defense counsel was in the unenviable position of selecting a strategy where Diazien's testimony might serve to exculpate Henning, knowing that the State would elicit testimony from Diazien that he was a successful con man and purported "master of illusion."  It is true that defense counsel made some references to Diazien, even in opening statement, that he was "absolutely a con artist."  [Tr.#9, p. 48.] However, that was exactly the type of testimony that the State elicited from Diazien on cross-examination, and was consistent with the defense theory to shift the blame to someone else.  Defense counsel could not have ignored the fact that Diazien would so testify, but counsel did what he could on redirect by asking Diazien if the ultimate con was to get someone else

to do something for Diazien when that person did not even realize what they had done. [Tr.#19, p. 174.]

233. Again, the Court does not find that the defense strategy, in light of all the circumstances of this case, was unreasonable. Thus, the Court does not find that counsel's performance was constitutionally deficient or that Henning suffered prejudice based on counsel's strategic choices.

234. **Defense counsel failed to raise objections regarding the "multitude of errors" in the DNA criminalistics report, dated 9/20/00, which formed the basis of the State's case against Henning. Also failed to preserve this issue for later review. Defense failed to present evidence that questioned the validity of test results from University of North Texas Health Science Lab, which purportedly experienced accreditation problems.** [Subclaims 37, 38, 45]

235. Henning attaches a number of pages from scientific reports with her hand-written notations as to alleged errors, and yet, Henning is not an expert. No evidence in the record exists, other than Henning's self-serving assertions, that there were errors in the report that went unchallenged.

236. Similarly, even if problems existed with accreditation for the University of North Texas Health Sciences Lab, the testing of much of the evidence was done elsewhere, and Henning fails to show how she was prejudiced.

237. **Henning directed defense counsel to file a "Bill of Particulars" regarding the perjury charges, and counsel refused, stating it was a waste of time.** [Subclaim 15]

238. Even if there were error by trial counsel, it was not prejudicial as the perjury convictions were later overturned by the New Mexico Supreme Court.

239. **Henning directed counsel to file a motion for a "gag order" and "change of venue" due to extensive and overwhelming negative publicity perpetrated by the prosecution. Defense counsel ignored Henning's request.** [Subclaim 16]

61

240.    The Court already addressed issues concerning venue and determined that Henning received "a fair trial by a panel of impartial, 'indifferent' jurors." Thus, even if counsel committed error, and no error was found, there was no prejudice.

241.    **Defense counsel failed to provide Henning with a mitigating specialist for purposes of the second phase, "life or death stage." There was no background done, no research, no documents nor evidence provided for defendant should she be convicted of "death."** [Subclaim 17]

242.    Henning is hard-pressed to show error or prejudice as her attorney succeeded in arguing for the jury to spare her life. Thus, the facts as alleged do not support a claim of ineffective assistance of counsel.

243.    **Defense counsel failed to file a motion for an evidentiary or "Daubert" hearing with expert witnesses, as is standard procedure in capital crimes cases especially in regards to DNA. Defense counsel failed to file a motion to compel the state court to require the State to preserve forensic evidence for defense testing. Defense wrote a motion for the State to Produce Blood Samples from the Crime Scene for independent testing and failed to submit it. Defense failed to file a motion to suppress DNA evidence. Defense failed to inform Henning she would have no expert witnesses for her defense until several days before trial.** [Subclaims 18, 19, 20, 21, 22]

244.    As stated previously, defense counsel's strategy was not to challenge the results of the DNA evidence or testing in this case. Instead, the chosen strategy was to rely on testimony by Diazien that he planted Henning's DNA at the crime scene. The Court will not disturb or second guess counsel's strategic decisions with respect to retaining experts, filing motions, challenging DNA evidence, or determining when to inform the client of particular decisions.

Claim II, Section II, Ineffective Assistance of Counsel Claims

245.    Henning argues that these ineffective assistance of counsel claims [section II] pertain to defense's failure to summon potential defense witnesses and documentation to support Henning.

246.     The Court refers to the <u>Strickland</u> standard above.  Again, Henning's burden is heavy. She must demonstrate that her attorney's representation was deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." <u>Strickland</u>, 466 U.S. at 687.   The Court views performance of counsel deferentially, indulging a "strong presumption" that counsel's conduct was "within the wide range of reasonable professional assistance." <u>Id.</u> at 689. Second, Henning must show that the deficient performance "prejudiced the defense." <u>Id.</u> at 687.

247.     **Defense counsel failed to present to the jury evidence concerning a potential witness, Delores de Vargas, who would have testified that she had seen Girly Chew several days after September 9, 1999.** [Subclaims 1, 2, 3.]

248.     Even if counsel had presented testimony by Ms. de Vargas, that would have opened the door to the State putting on volumes of evidence that Chew was never seen again after September 9th and was not seen leaving Albuquerque by any means of transportation after that date.  Second, the evidence of a single possible sighting is far from conclusive.  The police report, attached to Henning's habeas petition, further states that officers examined security tapes on the date in question and did not locate Girly on the tapes.  Ms. de Vargas, according to Henning, only knew Girly Chew through interactions with her at the bank.  Evidence of this possible sighting alone does not demonstrate prejudice, where Girly Chew was never located and Diazien testified that he had planned her murder which took place on September 9, 1999.

249.     **Defense counsel failed to present evidence concerning Girly Chew's neighbor, who would have testified that he smelled chemical products in use at Girly's apartment through the shared ventilation system on September 7. 1999.** [Subclaims 4, 5]

250.    Counsel's strategic decision not to present this evidence neither demonstrates constitutionally defective performance nor prejudice.  There was already testimony about a heavy odor of bleach.

**251.    Defense failed to present a trace evidence report by Detective Rocky Stone which would have discredited the evidence of a pink button found in Henning's car. Henning further argued that the "pink button" was used as an aggravator for the death-qualified trial "which is prone to conviction" and that the button had nothing to do with the case.  Defense counsel failed to properly notify Det. Stone in advance for a deposition or to summon him to trial.** [Subclaims 6, 7]

252.    Again, this is not evidence that trial counsel's performance was constitutionally defective, nor does Henning demonstrate how the failure to present such evidence rendered the outcome of the state court's proceedings unreliable.

**253.    Defense counsel failed to object to the admission of the gold-colored CD's when the "file date" of the CD's was 1996, three years before the disappearance of Girly Chew.  Henning argues that the CD's content was "presumed" and not proven and that there was no full disclosure as to the "true and accurate" content of the CD's.** [Subclaim 11]

254.    It is difficult to know what to make of the evidence concerning the "five gold CD's." The evidence was first presented at trial by the adoption agency director who testified that Diazien told her he had brought back the harvested eggs from a woman in Canada and created his son D and then stored all of this "information" on five gold CD's. [Tr.#10, p. 103.]

255.    Later Det. Fox testified that the police had been looking for the gold-colored disks and finally found them in late October 1999.  Henning had them and was hiding them from APD, according to Det. Fox's testimony. [Tr.#14, p. 36.] Det. Fox found Henning at a hotel in Albuquerque on October 29, 1999 and then secured a search warrant for her room.  He located the gold disks in a "Hershey's wrapper wrapped in tinfoil –Hershey's can . . . ." [Id.] There were Hershey's kisses on top

and three gold disks underneath.  Det. Fox viewed the disks and saw pictures of different apartment complexes, including Girly's apartment complex. [Id., p. 38.]

256.    On cross-examination, Fox testified that he examined the gold disks and they contained real estate information and that it was possible that the information was from 1996.  There were many real estate photos on the disks and not just Girly's apartment complex. [Tr.#15, pp. 75-76.] Det. Fox denied finding any information on the CD's regarding Diazien's claims that he could "save the world" or "engineer substances."  Counsel discussed, outside of the jury's presence, that the "real" CD's referred to by Diazien had been located and the State's request that they be produced. [Id., p. 77.]

257.    There was also testimony through Mary Alice Thomas regarding the CD's. [Tr.#16, p. 41.]  Henning told Thomas that Henning had some disks and serum that related to Henning being an "alien queen."  She gave Thomas the disks and asked her to keep them for her and to not tell the police about them if asked. [Id., pp. 41-42.] When police came looking for the disks, Thomas did not speak about the CD's.  She had hidden them in a candy box in her home.  She called Henning on about October 25, 1999 and told Henning she was not comfortable keeping her things and wished to return them to her.  Thomas gave the disks back to Henning, who was staying in a hotel then. [Id., pp. 41-43.]

258.    The Court cannot determine how the disks in question were harmful or helpful to Henning, other than to raise questions why Henning was hiding the disks from police and asking a friend to hide them for her.  In any event, defense counsel brought out that the real estate listings on the disks were from 1996.  There is no demonstration of constitutionally deficient performance by counsel nor prejudice.

**259.    Defense counsel failed to impeach Atlas Resource staff as to Henning's work performance and productivity "to refute character assassination." Defense failed to subpoena even one document from her employer to support her "defense."** [Subclaim 13]

65

260.    At trial, one Atlas Resources employee testified for the State.  On cross-examination, defense counsel asked about Henning's success in her position at Atlas Resources.  Thus, some evidence came in that Henning had been successful in that job.  There is no showing by Henning that additional evidence of her job performance would have assisted her defense.  In addition, the Court does not view the employee's testimony to be a "character assassination" of Henning.  Rather, the main intent of that testimony was to show Henning made a long telephone call to Diazien in South Carolina shortly after Girly Chew's disappearance. [Tr.#12, pp. 77-82.] Accordingly, the facts as alleged do not support a claim of ineffective assistance of counsel.

261.    **Defense counsel failed to introduce evidence that Girly Chew had wired money to her father, had $5,500 in Traveler's Checks, had spent $140.00 a month for karate lessons and yet had filed a pleading in court that she was impoverished and could no longer pay child support to Diazien.  Defense counsel failed to introduce evidence that detectives found what appeared to be "falsified immigration" documents and a "harassment log" in Girly's apartment.** [Subclaims 16, 17.]

262.    Evidence of the traveler's checks was introduced at trial, i.e., that traveler's checks in the amount of $5,500 were recovered from Girly Chew's safety deposit box. [Tr.#14, p. 55.] Thus, some of this evidence was admitted at trial.  Even if counsel committed error in not introducing other evidence, as described above, it is impossible to see how Henning was prejudiced.

Claim II, Section III, Ineffective Assistance of Counsel Claims

263.    The Court refers to the <u>Strickland</u> standard set out above.  In Section III, Henning claims that defense counsel was ineffective for a number of other reasons, including the failure to introduce certain statements of Miller or to subpoena Miller to testify.  Section III includes many claims that are repetitious of those already examined.  To the extent that the Court already determined that Henning did not demonstrate constitutionally defective performance of counsel or prejudice as to certain claims, the Court provides no further analysis, and instead, merely lists the claims below.

66

264. **Defense counsel's failure to uncover a "lead" concerning karate instructor Lucero's sighting of Miller in the karate studio parking lot.** [Subclaim 8]. This claim was discussed above. The facts as alleged do not support a claim of ineffective assistance of counsel.

265. **Defense counsel's failure to impeach detectives and police witnesses as to the collection, handling, and preservation of evidence**. [Subclaims 13, 14, 17, 18, 19.] These claims were discussed above. The facts as alleged do not support a claim of ineffective assistance of counsel.

266. **Defense counsel failed to cross-examine Officer Portwine regarding a report he filled out as to a potential witness, Ms. de Vargas, who would have testified she saw Girly several days after September 9, 1999.** [Subclaim 24] This claim was discussed above. The facts as alleged do not support a claim of ineffective assistance of counsel.

267. **Defense counsel failed to bring out evidence on cross-examination of "falsified immigration" papers found in Girly Chew's apartment, which Henning alleges is "motivation for Chew's disappearance."** [Subclaim 26] This claim was discussed above. The facts as alleged do not support a claim of ineffective assistance of counsel.

268. **Defense counsel failed to provide DNA expert witness to discredit APD's DNA printout of Henning's saliva.** [Subclaim 35] The expert witness issue was discussed above. The facts as alleged do not support a claim of ineffective assistance of counsel.

269. **Defense counsel failed to examine Det. Fox regarding a conversation with Miller when Miller talked about the skills and abilities of cadaver dogs. Defense counsel failed to summon Miller as a witness at Henning's trial so as to impeach his testimony concerning the allegedly altered tape recording, question him regarding notes made in his journal about killing animals and terrorizing women, and examine him regarding Miller's alleged "stalking" of Henning and other women. Defense counsel failed to summon Miller to Court to examine Miller about his "secret life," including his alleged serial womanizing and stalking habits while married, his membership with an underground militia, and other matters. Defense counsel failed to present evidence of the "love-hate" relationship between the State and Miller.** [Subclaims 1, 3, 7, 9, 12] The facts as alleged do not support a claim of ineffective assistance of counsel.

270. To the extent that Henning believes Det. Fox would have been permitted to testify about statements allegedly made to him by Miller, these would have been hearsay and most likely not allowed into evidence. Thus, counsel committed no error in failing to elicit from Det. Fox statements made by Miller.

271.    With respect to defense counsel's failure to summon Miller to trial, there is no certainty that Miller would have provided favorable evidence to Henning.  Indeed, it appears from the case record that Miller was expected to raise the Fifth Amendment privilege against self incrimination.  In any event, the decision whether or not to call Miller as a trial witness was a strategic decision by counsel that the Court will not second guess.  Henning demonstrated neither error by counsel nor prejudice.

272.    **Defense counsel failed to object to the admission of a taped recording between Henning and Miller when the chain of custody was in question after the tape was initially misplaced.  Defense counsel failed to disclose to Henning the existence of the Miller-Henning tape that had been lost, and she had no notice of the tape before its admission.** [Subclaims 2, 4]

273.    As stated previously, the State played the audiotape of the Miller-Henning conversation at trial and the tape was admitted, without objection. [Tr.#13, pp. 12-13.] Defense made  no argument that the tape was altered or edited, nor does Henning present evidence to support such a theory.  No issues were raised to challenge chain of custody.  Other than being misplaced during an attorney's move from one office to another, there is no evidence that the chain of custody was in question.  Only Henning makes this self-serving assertion.  In addition, Henning fails to show how she would have "marshaled a defense" had she reviewed the tape recording before its admission.  Thus, there is no demonstration of deficient performance by counsel nor prejudice.

274.    **Defense counsel failed to thoroughly cross-examine Det. Fox as to the existence of Henning's blood and the fact that APD possessed Henning's blood before the blood droplets were seen at Girly's apartment (according to some testimony) and before DNA testing.  Defense counsel failed to introduce evidence that Henning's menstrual blood was removed from her panties after being recovered from her car at her home.  Defense counsel could have forced State to disclose to the jury that APD was the only entity in possession of Henning's blood.  This was recorded in Det. Fox's hand-written notes according to Henning.  Defense failed to impeach Det. Fox regarding the fact APD possessed blood stained panties of Henning from September 12, 1999 and that the carpet was rolled up and collected on September 11, 1999.** [Subclaims 20, 21, 22]

275.   Henning is incorrect regarding whether testimony was admitted regarding her menstrual blood being found.  When cross-examining expert Dickey, defense counsel asked the expert if there were underpants taken from Henning's Honda.  Dickey stated that she probably could have determined whether the blood on the underpants was menstrual blood because it "would have different types of cells in it than blood from a vein." [Tr.#17, p. 164.] However, Dickey further stated they did not have that type of expertise at the lab (to test for menstrual blood).  Assuming such testing could have been done, it seems unlikely that it would have impeached Det. Fox's testimony or the DNA results showing Henning's blood in Girly's apartment.  If anything, that type of testing and result might have been damaging to Henning.  Henning may imply that the evidence collected by APD was not handled properly and that somehow Henning's menstrual blood was transferred from her panties to the carpet or couch in Girly's apartment.  This simply is not plausible.  Moreover, testimony was elicited through Diazien that Henning believed police had planted her blood in Girly Chew's apartment, so the theory was presented to the jury. [*See, e.g.,* Tr#19, p. 164.]

276.   However, the defense's primary theory was that Diazien planted Henning's blood in Girly's apartment.  The theory that police transferred Henning's menstrual blood to the apartment would have been incompatible with the primary defense.  This was a tactical choice of defense counsel to elect to rely on Diazien's testimony that he planted Henning's blood in the apartment and that she had nothing to do with the kidnapping/murder.  The Court will not second guess strategy decisions of counsel.  There is no demonstration of constitutionally defective performance, or prejudice.

277.   **Defense counsel failed to impeach Det. Fox's testimony in the first phase of the criminal proceeding (guilt or innocence).  Defense counsel should have asked Det. Fox if there was any evidence to suggest a murder or kidnapping occurred in the Chew apartment.  In the second phase of the criminal proceeding (life or death), defense counsel did ask the question of Fox who responded "no."  Henning speculates that had this question been asked in the first phase of the proceeding, she would not have been convicted.** [Subclaim 27]

278.    Henning is incorrect.  Defense counsel questioned Det. Fox extensively during cross-examination about the evidence found in Girly Chew's apartment and whether there was any indication of a struggle in the apartment or that a murder had been committed there. [Tr.#14, pp. 115-124.] Defense counsel specifically asked Det. Fox if there was any way to know if Girly Chew was dead or alive when she left the apartment on Sept. 9, 1999. [Id., p. 121.] Fox answered that there were indicators that Girly was still alive when she was taken from the apartment. [Id., p. 122.]

279.    Even if defense counsel had not elicited this testimony, Henning's supposition that a certain question would have exonerated her during the guilt or innocence phase is just that - supposition.  Mere speculation by Henning is not evidence of constitutionally defective performance by counsel, or prejudice.

**280.    Henning directed defense counsel to not call R. Michael Harvey as a defense witness because Harvey allegedly defrauded Henning of her bank account, personal assets, furnishing and vehicle.  Henning alleges it was not in Harvey's "self-interest" to see her acquitted.** [Subclaim 29]

281.    Harvey's testimony was favorable to Henning. [Tr.#19, pp. 181-190.] For example, Harvey spent time with Henning immediately after September 9, 1999, and testified he did not notice any type of injury to her hands or legs.  The tactical decision to call Harvey does not demonstrate constitutionally defective performance by defense counsel, nor did Henning demonstrate prejudice because of Harvey's testimony.

**282.    Defense counsel failed to elicit a statement by Det. Fox supposedly made to Harvey that the police did not believe Henning had killed Chew.  Defense counsel should have brought out testimony from an email written by Gary Wagner, a defense investigator to Attorney Gorman, that as late as one year after the kidnapping and murder, the State did not believe Henning was involved in Girly Chew's disappearance. Defense failed to preserve this claim (32) for later review.** [Subclaims 30, 32, 33]

283.     Even if defense counsel had brought out such testimony from Fox, more than likely, he would have testified that police initially did not think Henning had killed Chew, because attention was focused primarily on Diazien at the beginning of the investigation.   Clearly, however, that perception changed as the investigation ensued.   If Fox had testified that had been the police's belief, he also would have testified that view changed as the evidence was developed.

284.     In view of all the other evidence in this case, it is highly unlikely that one statement regarding "the State's" belief supposedly made in 2000, would have assisted Henning in her defense. In addition, the statement was probably hearsay or double hearsay.

285.     In addition, Henning was not convicted of first degree murder of Girly Chew.   Thus, there is neither evidence of constitutionally defective performance by counsel nor prejudice.

<u>Claim II, Section IV, Ineffective Assistance of Counsel Claims</u>

286.     The Court refers to the <u>Strickland</u> standard set out above.   In Section IV, Henning primarily argues that defense counsel was ineffective in impeaching State expert witness Dickey and others, as well as Felissa Garcia Kelley, who had been Diazien's divorce attorney during the divorce proceedings initiated by Girly.   To the extent that some of the claims are duplicative, the Court lists the claims with brief analysis.

287.     **Defense counsel failed to impeach State's experts Dickey and Arbogast regarding evidence of saliva and related exhibit.   Failure to preserve claim for later review.** [Subclaims 8, 9.] The expert witness issue was discussed above.

288.      In view of the evidence, defense counsel did an able job in attempting to impeach the State's scientific experts.   The facts as alleged do not support a claim of ineffective assistance of counsel.

289.     **Defense counsel failed to raise an objection to the admission of "altered evidence in the form of a letter rewritten by the prosecution . . . ."** [Subclaim 29]

290.    To the extent Henning is referring to the letter she wrote to Diazien concerning the pink button, the Court already addressed this claim above.  The facts as alleged do not support a claim of ineffective assistance of counsel.

291.    **Defense counsel failed to secure adequate funds for the defense and for expert witnesses for trial, even though Diazien's attorneys secured funds for his defense and DNA testimony, and the State spent millions of dollars in the largest DNA case in New Mexico history.** [Subclaim 30] See discussion above.  The facts as alleged do not support a claim of ineffective assistance of counsel.

292.    **Testimony was not elicited from witnesses that testing of evidence was not performed when witnesses claims it was done.  Thus, there were questions regarding the integrity of the witnesses and their evidence or testimony.** [Subclaim 22]

293.    Based on the Court's review of the trial transcripts and case record, there is no evidence to support Henning's allegations.  Thus, the Court finds no showing of constitutionally defective performance by counsel or prejudice.

294.    **Defense counsel failed to negate prosecutor's misrepresentations (apparently made in opening statements before a grand jury) regarding the blood found in Girly's apartment being positively identified as Henning's.  At that time, according to Henning, the State argued that Henning's blood had been identified early on as appearing in Girly's apartment when other reports stated no testing was done prior to September 2000.** [Subclaim 25]

295.    Expert Dickey testified that blood found at Girly Chew's apartment had been identified as Henning's.  She also testified that they began testing the blood on the carpet as early as September 14, 1999. [Tr.#17, pp. 132-36.] The Court finds no showing of constitutionally defective performance by counsel or prejudice.

296.    **Defense counsel failed to impeach State's witness Dickey as to the head-hair initially identified as being from Miller and later identified positively as that of Henning's.** [Subclaim 12]

297.    This evidence was brought out in defense counsel's cross examination of State experts. For example, when questioning State's expert Arbogast, defense counsel stated that the mitochondrial

DNA on the hair was initially analyzed as being that of Bill Miller and later shown to be Henning's hair. [Tr.#17, p. 32.] Arbogast admitted that was true and that it was possible mistakes could be made. Defense counsel continued to raise this issue with Arbogast later in the cross-examination as well. [Id., pp. 47-48.]  Thus, the appropriate witness was impeached to the extent possible.  Accordingly, the facts as alleged do not support a claim of ineffective assistance of counsel.

> 298.   **Defense counsel failed to disclose to the trial jury the underlying reasons Attorney Felissa Kelley was testifying against Henning.  Henning claims that Kelley was testifying for purposes of gaining leniency for her brother who had been indicted on a murder charge.  Henning alleges that "defense" [sic?] did not reveal the "Brady material" to either trial jurors or to Henning.  Henning also asserted that Kelley was induced to provide testimony that she had observed Henning shortly after September 9, 1999, with bandages on her fingers and that Kelley perjured herself.** [Subclaim 1]

299.   There was no evidence in the record that Felissa Kelley obtained leniency for her brother by testifying at Henning's trial.  Kelley had been listed as a trial witness from this case's inception.  Moreover, in contrast to Kelley's very uncertain testimony at trial, defense counsel was able to elicit testimony from many other State's witnesses that Henning was not observed with any injuries shortly after September 9, 1999.

300.   Kelley testified very hesitantly at trial.  She gave one-word answers for the most part or stated she "did not recall" in response to a number of questions.  Even when stating she recalled Henning having bandages on her fingers, she said the memory was "vague." [Tr.#16, p. 98.] She testified more often than not at trial of "no recall."  For example, when listening to a tape recorded conversation between her and Henning, Kelley could not "recall" who was speaking at one point.  She could not "remember" what Henning had given to her (as referred to in the tape recording). [Id., p. 95.] While out of the presence of the jury, Kelley testified that she had not felt threatened by Henning, except on one occasion when she received a threatening letter from Henning. [Id., p. 109.]

301.    Henning presented no evidence of constitutionally defective performance by counsel. Defense counsel kept out of evidence a letter written to Kelley by Henning that would have been very damaging to Henning.  Moreover, Henning's attachment of Kelley's letter to Henning, written in February 2005, after Henning was convicted, is of no significance.  The letter, marked attorney-client privileged, is odd and unconvincing, especially because Kelley did not have an attorney-client relationship with Henning.

302.    **Defense counsel failed to impeach State's expert Dickey regarding "mixed wipestain" which was listed in her notes as being two pieces of fabric instead of one as indicated by a custody tag.  Defense counsel failed to object to the "mixed wipestain" being positively identified as belonging to Henning despite DNA notes of Dickey and a report suggesting it was not conclusively Henning's.** [Subclaims 13, 15]

303.    There was testimony at trial about a stain or stains found on Girly's blouse recovered in the Magdalena area that contained mixed stains, that matched standards from both Girly and Diazien.  The Court cannot determine what "mixed wipestain" to which Henning refers.  In any event, the Court finds no evidence of constitutionally defective performance by trial counsel, or prejudice.

304.    **Defense counsel failed to reveal that foreign DNA was found in Henning's Honda and in the apartment that was not related to anyone.** [Subclaim 16]

305.     Testimony was elicited from State's expert Arbogast on direct and cross-examination that there was hair found on Girly Chew's carpet that was not consistent with Defendant, Miller, or Diazien. [Tr.#17, pp. 12, 40.] Similarly, expert Dickey testified that one of the gray hairs found on Girly Chew's carpet did not match anyone's profile they had. [Id., pp. 115-16.] In addition, on cross-examination of Dickey, defense counsel elicited testimony that blood was found in Henning's Honda but that it could not be attributed to any of the known sources they had. [Id., p. 164.] The Court determines that the testimony actually was elicited.  Thus, there is no evidence of constitutionally deficient performance by counsel or prejudice.

74

306.    **Defense counsel failed to impeach Dickey to show her testimony was filled with erroneous or conflicting testimony "represented by the DNA Criminalistics Report issued on 9/20/00 and Grand Jury Exhibit 48 of so-called DNA matches of 11/16/99."** [Subclaim 17]

307.    The Court concludes that defense counsel attempted to impeach expert Dickey as best as was possible.  Henning fails to identify the "erroneous or conflicting testimony."  Even if true, "[c]ounsel's decision not to list for the jury every possible inconsistency in the testimony cannot be said to be ineffective assistance."  Barkell v. Crouse, 468 F.3d 684, 692 (10th Cir. 2006) (internal citation omitted).  There is no evidence of constitutionally defective performance by counsel or prejudice.

308.    **Defense counsel failed to object to the admission of a contaminated hair specimen which the University of North Texas health Sciences marked as "broken glass specimen" belonging to Henning allegedly.  Defense counsel failed to preserve this issue for appeal.** [Subclaims 20, 21]

309.    Although Henning attaches pages of apparent discovery to her petition, these references do not match her claims.  For example, she refers to a specimen, marked F-2013.15 with a description and then Henning provides her own handwritten notes that there was a "broken specimen slide" and that it "must be dismissed tampered."  Nothing in the evidence confirms her allegations.  Thus, there is no showing of constitutionally defective performance by counsel, or prejudice.

310.    **Defense counsel failed to elicit testimony that some testing was done showing more than 11 genetic markers between Henning and Diazien's DNA, which, according to Henning indicated a familial blood relationship between Henning and Diazien, a physical impossibility.  Defense failed to preserve this issue for appeal**. [Subclaims 27, 28.]

311.    The Court finds no such evidence in the record to confirm Henning's allegations.  Even if true, there was no prejudice to Henning in the failure to elicit testimony regarding this alleged evidence.

312. **Defense counsel failed to present to the jury evidence of a motion to compel disclosure filed by previous attorney Gorman which would have contradicted exhibit 48.** [Subclaim 31]

313. The Court considers this claim as one challenging the attorney's tactical decisions regarding which evidence to present. The Court will not second guess defense counsel's strategic choices at trial. Thus, the facts as alleged do not support a claim of ineffective assistance of counsel.

314. **Defense counsel failed to inform the jury that the first grand jury was "nollied due to the serious ethical violation on the part of two prosecutors. . . ."** [Subclaim 32]

315. The Court finds no evidence that the first grand jury was nolle prosequi due to ethical violations by the State. In support of this subclaim, Henning apparently attaches a motion to dismiss grand jury indictment and disqualify prosecutor filed by Diazien's attorneys. There is no evidence to show that Diazien's motion was granted or that the State engaged in the conduct as alleged in Diazien's motion. Henning fails to demonstrate constitutionally deficient performance on the part of her attorneys, or prejudice.

316. Finally, with respect to all of the alleged ineffective assistance of counsel claims, the Court observes that Henning raised some or all of these same issues on direct appeal and in her state habeas petition. Henning made no showing that any of the above-described state court decisions were contrary to or involved an unreasonable application of clearly established federal law as set forth by the Supreme Court. Similarly, Henning did not demonstrate that any of the state court decisions were based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Therefore, the Court recommends that all of the claims alleging ineffective assistance of counsel be denied and dismissed.

### III.  Alleged Prosecutorial Misconduct

Claim III, Section I, Prosecutorial Misconduct Claims

317.    As part of this claim, Henning asks generally if the prosecution applied "due or extreme diligence in their efforts to collect, preserve, track and log in evidence?  especially evidence of an exculpatory nature?"

318.    Under Brady v. Maryland, 373 U.S. 83 (1963), state prosecutors must turn over exculpatory and impeachment evidence, whether or not it is requested by the defense, if the evidence is material either to guilt or punishment.  *See, e.g.,* Strickler v. Greene, 527 U.S. 263, 280 (1990); United States v. Bagley, 473 U.S. 667, 676 (1985).  An individual prosecutor has a duty to learn of any favorable evidence known to others acting on the state's behalf, including the police.  Strickler, 527 U.S. at 281.  However, the Brady rule does not require the prosecutor to deliver his entire file to defense counsel.  Rather, the prosecutor must disclose those items that are material to a defendant's guilt or punishment.  Bagley, 473 U.S. at 675.

319.    There are three components of a true Brady violation: (1) the evidence must be favorable to the accused, either because it is exculpatory or is evidence of impeachment; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.  Strickler, 527 U.S. at 281-82.

320.    Here, while Henning generally contends that exculpatory evidence might have existed, she does not identify such evidence or demonstrate that it would have been favorable, that the State suppressed it or that prejudice might have ensued.  Thus, the Court finds no Brady violations even though Henning surmises that exculpatory evidence might have been withheld.  Her speculation alone does not support a claim of a Brady violation.

321.     The majority of Henning's prosecutorial misconduct claims focus on allegations of the State's use of tampered, "cross-contaminated," or inadequately collected evidence, e.g., the pink button found later in Henning car's after it was sold to a third-party, the broken glass specimen slide, evidence presented to the jury before testing was completed, a drop cloth/tarp found in Magdalena allegedly placed in contact with a drop cloth/tarp found in Henning's home, DNA evidence consumed in testing by the State, evidence referred to inconsistently as consisting of one or two pieces of fabric, evidence improperly collected in an "open, unsealed ziplock bag," evidence collected by police but not secured properly, evidence collected by police and retained for months before being turned over and tested, tape recordings improperly relied on and admitted by State during trial (between Henning and Kelley, and between Henning and Miller), and evidence of sand art and glitter from Henning's garage that was transferred to the Magdalena tarp by the State and police during their investigation. [Subclaims 1, 2, 3, 4, 5, 6, 7, 8, 12, 13, 14, 16, 17, 20]

322.     Where a petitioner does not allege that a prosecutor's argument or actions directly affected a specific constitutional right, as is the case here, the Court applies the standard articulated in Donnelly v. DeChristoforo, 416 U.S. 637, 643-44 (1974).  Under Donnelly, habeas relief is available for prosecutorial misconduct only when the misconduct is so egregious that it renders the entire trial fundamentally unfair.  Tolbert v. Ulibarri, 2009 WL 1101397, at *2 (10th Cir. Apr. 24, 2009) (citing Donnelly, 416 U.S. at 642-48).

323.     The Court conducted a review of the entire trial and state court record proper.  Counsel examined a number of trial witnesses about the possible transfer of trace evidence or blood from one location to another.  In other words, counsel elicited testimony at trial concerning much of the evidence that Henning claims to have been "cross-contaminated."  In addition, there was ample evidence that a jury could have believed in convicting Henning of felony murder and other charges.

For example, her blood was located at Girly Chew's apartment when Henning stated she did not know

Girly, did not know where she lived, and, of course, had never been to her apartment.  While much

of the evidence was circumstantial, there was physical evidence and an abundance of circumstantial

evidence connecting Henning to the crime scenes or involvement with Diazien to kidnap/murder

Girly.  Even though there was some inconclusive evidence presented at trial, reasonable jurists would

agree that the presentation of such inconclusive evidence did not render her trial fundamentally unfair.

*See* Young v. Workman, 383 F.3d 1233, 1238 (10th Cir. 2004).

324.    Moreover, while Henning claims the police and State utilized sloppy and improper

collection procedures, there was no evidence to confirm poor handling practices by the police or State

or that evidence was contaminated.  Similarly, there was no evidence that tape recorded conversations

were altered before being admitted at trial.  Henning's speculation, guess and conjecture, standing

alone, are insufficient to demonstrate prosecutorial misconduct.

325.    Henning presents little if any evidence to show prosecutorial misconduct and no

evidence that was so egregious that it rendered the entire trial fundamentally unfair.  Thus, the

prosecutorial misconduct claims cannot survive.

326.    Henning also alleges under Section I that the State publicly alleged, over a period of

three years before her trial, that Henning was "a homewrecker, a hit woman, a murderer who planned

a murder for hire, a Ninja assassin warrior, and a cannibal . . . ."  Henning argues that the State made

these remarks to taint the jury pool and ensure Henning would not receive a fair trial.  To some degree,

this subclaim was addressed previously above (regarding the alleged tainted jury pool). [Subclaim 18]

327.    In support of subclaim 18, Henning attaches a CNN online news article from Court TV,

dated January 7, 2003, in which it was reported that New Mexico prosecutor claims "fashion designer

Henning" told at least four people that she consumed the flesh of Girly Chew.  It is true that in the

State's amended sentencing memorandum, the prosecutor alleges that more than one individual reported Henning to have made remarks that she had consumed the flesh of Girly Chew. [RP 621.] And, moreover, when Henning addressed the Court at her April 18, 2003 sentencing, she also argued that the State alleged she was a "cannibal, an alien queen, and a Ninja Assassin warrior." [Tr.#29, p. 49, April 18, 2003 hearing.] However, none of those allegations were presented to a jury.  Henning did not demonstrate that the jury or the jury pool was made aware of these alleged remarks before the trial.  In other words, the jury had already convicted Henning before the CNN news article was aired. In addition, the allegations did not appear to affect the Court in its sentencing decision as it initially delayed sentencing so that Henning could be further evaluated, which gave Henning the option to provide more information to the State if she had it, and to possibly reduce her sentence.  The Court could have sentenced Henning to a longer period of incarceration, as requested by the State, but did not do so.

328.   "Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." Douglas v. Workman 560 F.3d 1156, 1177 (10th Cir. 2009) (*citing* United States v. Young, 470 U.S. 1, 11(1985)). Habeas relief is appropriate only when a prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Id. (*citing* Donnelly, 416 U.S. at 643).  Here, Henning did not demonstrate that the prosecutor's statements, made in a sentencing memorandum, affected the trial at all.  Moreover, even if a prosecutor's remarks are undesirable or "even universally condemned," that, without more, is insufficient to demonstrate prosecutorial misconduct. Darden v. Wainwright, 477 U.S. 168, 181, *reh'g denied,* 478 U.S. 1036 (1986).

Claim III, Section II, Prosecutorial Misconduct Claims

329.    Under this section, Henning questions whether the prosecution's witnesses presented accurate and truthful evidence to the trial court.   Whether included in the claims of ineffective assistance of counsel, due process violations, or prosecutorial misconduct, the subclaims noted below have all been addressed by the Court.   The Court lists the claims below but adds only brief commentary, where appropriate.

330.    **Henning states Ex. 48 was used to secure an indictment of her before the Grand Jury, when that exhibit contained false or erroneous information.** [Subclaim 1] This claim does not rise to the level of a constitutional violation.

331.    **State failed to disclose to the Grand Jury, at the <u>Ogden</u> hearing or during trial the existence of their own trace evidence specialist Det. Rocky Stone, whose report discounted the relevance of the pink button evidence.** [Subclaim 2]  This claim does not rise to the level of a constitutional violation.

332.    **State altered letter written by Henning to "co-defendant" and inappropriately introduced it as "truthful evidence, when in fact it was patently false."  State re-wrote letter, deleting punctuation.** [Subclaim 3]  This claim does not rise to the level of a constitutional violation.

333.    **Prosecution and State's witnesses misrepresented mitochondrial evidence to the Grand Jury and trial jury.  Henning argues the meaning of scientific and DNA terminology.** [Subclaim 4]  This claim does not rise to the level of a constitutional violation.

334.    **State's expert Dickey made misrepresentations to the Grand Jury.** [Subclaim 5] This claim does not rise to the level of a constitutional violation.

335.    **Prosecution and Dickey knowingly and purposefully submitted broken glass specimen to the University of North Texas Health Sciences Dept. purportedly containing a hair from Henning's head.  The evidence had been tampered with or was contaminated.** [Subclaim 6]  This claim does not rise to the level of a constitutional violation.

336.    **Prosecution and Det. Fox placed the tarp from Henning's home in contact with the tarp found near Magdalena, thereby contaminating the evidence.** [Subclaim 7]  This claim does not rise to the level of a constitutional violation.

337.    **Prosecution and Det. Fox presented misleading testimony to the jury by stating Henning had cuts and wounds on her from a "pitched battle."** [Subclaim 8]

81

338.   Upon reviewing the entire record, the Court did not locate any testimony by Fox that he observed cuts and wounds on Henning when he interviewed her after September 9, 1999.  Indeed, Fox testified on cross-examination that he had not noted any injuries on Henning when he saw her on September 12, 1999. [Tr.#14, 127.]  During direct examination, the prosecutor asked Det. Fox what hand Henning was using to write with during the trial, and he responded she was using her right hand.  In contrast, a videotape showed her using her left hand on September 12, 1999, when she gave an initial statement to the police. [Tr.#12, p. 137.]  The jury was allowed to draw whatever inferences it did as to that type of evidence.  The phrase "pitched battle" was not used by the prosecution during trial.  Thus, this claim does not rise to the level of a constitutional violation.

339.   **Prosecution told the September 1999 Grand Jury that all blood testing was done and that the blood droplets were positively identified as being Henning's. Henning claims no such testing was done at that time.** [Subclaim 9]  This claim does not rise to the level of a constitutional violation.

340.   **The "mixed wipestain" is misrepresented as being a positive match to Henning in the September 20, 2000 DNA report when the result is noted as "inconclusive" in another part of the report.** [Subclaim 10]  This claim does not rise to the level of a constitutional violation.

341.   **Prosecution failed to open the gold CD's to ensure relevance before the case went to trial.  The file date on the CD's was 1996.  Prosecution hid the actual contents of the CD's from the defense.** [Subclaim 11]  This claim does not rise to the level of a constitutional violation.

342.   **Integrity of the State's evidence was questionable due to unsubstantiated "claims" made by APD personnel to the September Grand Jury that four blood droplets had been positively identified as belonging to Henning.** [Subclaim 12 (part of it)] This claim does not rise to the level of a constitutional violation.

343.   **Evidence was contaminated.  Conflicting testimony.** [Subclaim 13 (part of it)] This claim does not rise to the level of a constitutional violation.

344.   **State expert Dickey misrepresented actual test results from stains on Girly's blouse.  Conflicting testimony.** [Subclaim 14]  This claim does not rise to the level of a constitutional violation.

345.  **State assured Defense through correspondence in 2001 that evidence would be preserved for the defense.  Evidence was then consumed or destroyed.** [Subclaim 15a]

346.  There was testimony at trial by the State's experts that it had to consume some of the evidence it tested because the samples were so small.  This claim does not rise to the level of a constitutional violation.

347.  **Prosecutor released a statement to the newsmedia that Henning was a cannibal when there was no such evidence.  He did it to taint jury pool.** [Subclaim 18]  This claim does not rise to the level of a constitutional violation.

348.  **Prosecutor screamed at defense counsel demanding that defense counsel be more "reverential" towards the carpet that was laid out at trial as an exhibit.** [Subclaim 19]

349.  While the prosecutor did interject an unusual objection concerning the carpet, the statement does not rise to the level of prosecutorial misconduct.

Claim III, Section III, Prosecutorial Misconduct Claims

350.  Henning asserts that the prosecution coerced or threatened witness testimony and questions whether the prosecution brought forth key material witnesses.  Again, these claims, for the most part, have been addressed above.

351.  **Prosecutor coerced Felissa Kelley to commit perjury and testify falsely against Henning.  Kelley later wrote a letter of apology to Henning (after the trial).  Prosecution failed to disclose prior impeachable testimony and the favorable inducement for Kelley's trial testimony re: Kelley's brother who was arrested for murder.  Kelley's testimony about seeing bandages on Henning's fingers was discredited by the videotaped interview of Henning.** [Subclaim 1]  This claim does not rise to the level of a constitutional violation.

352.  **Prosecution threatened State witness Mary Alice Thomas with criminal charges if she did not "stay with the State's script."  No other witness corroborated Ms. Thomas' testimony.** [Subclaim 2 (part of it)]

353.  Thomas testified about a number of things, primarily her long-standing friendship with Henning.  Thomas testified that Henning showed her a sword in Henning's garage and that Henning

stated she had to "fight her battles with" the sword.  She told Thomas that she had been appointed a queen of the world and that she was responsible for saving the world from other queens coming from other planets. [Tr.#16, p. 36.]

354.    Thomas testified that Henning told her she could take the Fifth Amendment, rather than respond to grand juror questions.  Thomas explained that the grand jury proceeding was a rough experience for her and it resulted in her receiving a grant of immunity for perjury, harboring a felon and tampering with evidence. [Id., p. 39.]

355.    Thomas' trial testimony was damaging for Henning.  She testified that Henning told her that she did not have to relate their prior conversations. [Id., p. 40.] Thomas' testimony as to what Henning told her concerned the gold CD's that Thomas hid for Henning.  Thomas also testified that Henning drove Thomas home one day after September 9, 1999, and pointed out where Girly Chew lived. [Id., p. 43.]

356.    Thomas also testified that Henning gave Thomas some blank, signed checks in September and told Thomas that Henning felt concerns for her own safety, and if seriously hurt, she would not be able to access money from her accounts. [Id., p. 46.]

357.    Thomas admitted to initially lying to the grand jury because she wanted to protect Henning, who was her friend. [Id., p. 47.]

358.    At trial, defense counsel asked Thomas whether she had been threatened with perjury before the grand jury proceeding, in an attempt to explain her testimony at trial. [Id., p. 50.] Defense counsel also brought out that Henning made it very clear to Thomas that Henning had nothing to do with the kidnapping and murder of Girly. [Id., pp. 58-59.] Thomas testified that Henning also told her that the blood found at Girly's apartment, which linked Henning to the crime scene, must have been

84

planted.  [Id., pp. 74-75.] Thomas never saw any wounds or scratches on Henning after September 9, 1999.

359.    Thomas was not only confronted by the prosecution during the grand jury proceedings., but also by a grand juror who told her at one point, "You are lying through your ass?" [Id.]

360.    Based on a full review of Thomas' testimony and all of the trial testimony, and contrary to Henning's contentions, Thomas did not "stay with the State's script."  She provided both damaging and favorable testimony. The Court determines there is no evidence of prosecutorial misconduct.

361.    Henning raised prosecutorial misconduct claims in her state habeas petition. The Court neither finds that the state court, in denying these same claims, reached a decision that was contrary to, or involved an unreasonable application of established federal law, nor that its decision was based on an unreasonable determination of the facts in light of the evidence presented.  Thus, the Court recommends denial of the prosecutorial misconduct claims.

### IV.  Alleged Insufficiency of Evidence

362.    Henning alleges that the State had "no truthful nor accurate" evidence to either indict or convict her and that they presented erroneous evidence to the grand jury, the trial jury and at hearings.  "They did this knowingly, willingly, and intentionally to deceive the courts."  Thus, Henning claims that there was insufficient evidence to support her convictions.  Yet, Henning does not specifically challenge any single conviction or element of a crime.  In other words, Henning does not argue that there was insufficient evidence to show she "helped, encouraged the felony of Kidnapping to be committed," or that there was insufficient evidence to show that "Girly Chew was killed during the commission or attempted commission of the Kidnapping." [See, e.g., RP 460, Jury Instruction No. 6, second indictment.]

363.     Henning's arguments are general in nature.   She sets forth essentially the same challenges to the evidence that supported her other claims, including the claims of ineffective assistance of counsel and prosecutorial misconduct.   Henning asks the Court to accept her hypotheses, which she posits are or could be consistent with a finding of innocence, and to reject all of the evidence consistent with the trial jury's verdict.   She argues, for example, that the collection of evidence was handled in a sloppy manner leading to cross-contamination of the evidence and that, therefore, any laboratory results linking her DNA to the crime scenes are inconclusive or undependable.   She claims that DNA and scientific testing was inaccurate and inconsistent and that the results of testing were not definitive.   In addition, she argues that the prosecution should have handled its own case differently by calling certain witnesses who purportedly would have provided testimony favorable to Henning.

364.     The Court summarizes the insufficiency of evidence claims below.

365.     **Exhibit 48 used at the first grand jury proceeding was erroneous or misleading as it stated DNA matches had been made implicating Henning, when other evidence showed no testing had been done this early.  Blood drops found in Girly Chew's apartment attributed to Henning were not Henning's and no testing confirmed they were Henning's when the first grand jury met.  The DNA criminal report, dated September 20, 2000, was filled with errors and contained inconsistent and inconclusive results.  Henning argues again that the "head hair" claimed to have belonged to Henning "was not only NOT a match to the hair allegedly from the tarpaulin, . . . the hair was 'only consistent' not exact."  Moreover, there was contamination of the hair sample that was submitted for testing on a broken glass specimen.  The State identified one gray hair as being Diazien's but another crime report lists the results as "inconclusive or "unknown."**  [Subclaims a, b, d, I, j]   This claim does not rise to the level of a constitutional violation.

366.     **Henning was not at the crime scene nor in Magdalena at the time of the crime, which is substantiated by financial transactions made in Albuquerque at various times on September 9, 1999.   According to Henning, "this has never been seriously challenged."** [Subclaim e]   This claim does not rise to the level of a constitutional violation.

86

367. **Miller's civil attorney presented argument or evidence that detectives placed the drop cloth found in Henning's home in direct contact with the drop cloth found in Magdalena, thereby contaminating the evidence and transferring trace evidence. The APD detectives who collected evidence held onto it for months before submitting it for testing.  Expert Dickey wrote in her report that the "mixed wipestain" was two pieces of fabric and positively identified the stains as belonging to Henning.  According to Henning, the mixed wipestain was on one piece of fabric, not two, and testing results were inconclusive.**   [Subclaims f, p, q]  ]  This claim does not rise to the level of a constitutional violation.

368. **Det. Fox testified at trial that he saw cuts and wounds on Henning despite a videotaped interview with Henning on September 12, 1999, showing "no cuts and no wounds."  When questioned by defense counsel during the death penalty phase, Det. Fox allegedly testified that there was no evidence to suggest a murder or kidnapping occurred in Chew's apartment.**   [Subclaims l, m] This claim does not rise to the level of a constitutional violation.

369. **The prosecution ignored their own trace evidence report and Det. Rocky Stone's potential testimony that the pink button did not connect Henning to the crime. The State erroneously submitted this evidence to ensure a death penalty qualified trial.** [Subclaim n] This claim does not rise to the level of a constitutional violation.

370. **Prosecution failed to summon Ms. de Vargas who would have testified that she had seen Girly Chew a few days after September 9, 1999.  The DNA evidence, "the blood evidence, the hair, the wipestain all [are] in serious question."  The evidence was subjected to cross-contamination.  The State consumed or destroyed the evidence thereby preventing the defense from testing the same evidence.** [Parts of subclaim r]   This claim does not rise to the level of a constitutional violation.

371. With respect to a challenge to the sufficiency of the evidence, clearly established federal law provides that the court review the record as a whole and consider the evidence in the light most favorable to the prosecution.  The pertinent inquiry is whether the evidence is such that *any* reasonable jury could find the defendant guilty beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 317, 99 S.Ct. 2781, *reh'g denied*, 444 U.S. 890 (1979) (emphasis in original); United States v. Hien Van Tieu, 279 F.3d 917, 921-22 (10th Cir. 2002).  In reviewing the evidence, the court does not weigh conflicting evidence or consider witness credibility as those were duties delegated to the jury.  Hien Van Tieu, 279 F.3d at 921.

372.    More recently, the Tenth Circuit Court of Appeals stated:

"This standard reflects our system's longstanding principle that it is the jury's province to weigh the evidence and to draw reasonable inferences from testimony presented at trial." <u>Turrentine v. Mullin</u>, 390 F.3d 1181, 1197 (10th Cir. 2004). Our review is "sharply limited," and when there are conflicting facts in the record that permit disparate inferences, the Court "must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Id.</u> at 1197 (*quoting* <u>Messer v. Roberts</u>, 74 F.3d 1009, 1013 (10th Cir. 1996)).

<u>Wilson v. Sirmons</u>, 536 F.3d 1064, 1105 (10th Cir. 2008), *reh'g en banc granted,* 549 F.3d 1267 (10th Cir. 2008, *cert. denied,* 532 U.S. 1028 (2008).

373.    The New Mexico Supreme Court applies this same standard of review for sufficiency of the evidence claims. In <u>State v. Sutphin</u>, 107 N.M. 126, 130-31 (1988), the New Mexico Supreme Court stated:

An appellate court does not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence. Instead, the test to determine the sufficiency of evidence in New Mexico . . . is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction. A reviewing court must view the evidence in the light most favorable to the state, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict. This court does not weigh the evidence and may not substitute its judgment for that of the fact finder so long as there is sufficient evidence to support the verdict.

<u>Id.</u> (internal citations omitted). The Eighth Circuit similarly explained:

It must also be recognized that a defendant in a criminal case may properly be convicted on circumstantial as well as direct evidence. It is sufficient if the entire body of evidence, whether direct or circumstantial, or both, is adequate to convince the jurors beyond a reasonable doubt as to the truth of the charge.

United States v. Rhoads, 617 F.2d 1313, 1316 (8th Cir. 1980).  *See also* United States v. Thurston, 771 F.2d 449, 452 (10th Cir.1985) (in reviewing the sufficiency of the evidence, "circumstantial evidence is entitled to the same weight as that given to direct evidence").

374.    Henning raised the sufficiency of evidence claim on direct appeal.  The New Mexico Supreme Court rejected the claim, finding:

> Based on the physical evidence linking [Henning] to the kidnapping, the physical evidence that the kidnapping occurred in a violent manner, and the circumstantial evidence linking [Henning] to [Diazien's] plan to kidnap and murder the victim, a reasonable jury could have concluded that [Henning] had the requisite intent to commit felony murder. . . . Additionally, this evidence was sufficient to prove [Henning's] guilt of conspiracy to commit kidnapping.  In proving conspiracy, the State was not required to show that [Henning] entered into an express or formal agreement to commit kidnapping.  Therefore, we hold that '[t]he State introduced sufficient evidence to satisfy the ultimate standard of due process.'

Doc. 12, Ex. H, pp. 14-15 (internal citations omitted).

375.    Henning also raised the sufficiency of evidence claim in her state habeas petition.  The state court judge noted it had made an exhaustive review of the record and found no new issues. [Doc. 12, Ex. K, p. 1.] In addition, the state court specifically addressed the sufficiency of evidence claim noting that it was previously raised before the Supreme Court and rejected.  Although Henning's arguments were "lengthy and convoluted," they were without merit. [Id., p. 2.]

376.    The Court cannot weigh the evidence differently and substitute its own judgment for that of the jury.  By way of example, the Court considers Henning's position that there was compelling evidence showing she was not at the scene of the crime.  However, another equally plausible explanation was that someone had her ATM "pin" number and was using her ATM card to create transactions that could possibly place Henning away from the crime scene.  In addition, there are large gaps in time on the evening of September 9, 1999, during which her whereabouts were unknown.

There was significant direct and circumstantial evidence linking Henning to Girly Chew's apartment and to the disappearance of Girly Chew.  Evidence is sufficient to support a conviction when direct and circumstantial evidence, together with reasonable inferences to be drawn from such evidence, would lead a jury to find a defendant guilty beyond a reasonable doubt.  *See, e.g.,* United States v. Ray, 973 F.2d 840, 842 (10th Cir. 1992).  The Court concludes that a reasonable jury could have properly inferred that Henning helped or encouraged the felony of kidnapping, that she intended the kidnapping to be committed and that as a result of the kidnapping, Girly Chew was murdered.

377.    After viewing the evidence in the light most favorable to the prosecution, the Court concludes that Henning's arguments as to the alleged insufficiency of the evidence lack merit.  The Court is convinced that based on the wealth of physical and circumstantial evidence [*see supra* ] "any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." *See* Jackson, 443 U.S. at 319.  Even if the facts in the record supported conflicting inferences, the Court presumes "that the trier of fact resolved any such conflicts in favor of the prosecution."  Id. at 326. Thus, the fact that Henning may, on occasion, identify evidence that could support conflicting inferences, is insufficient.

378.    Moreover, the state courts addressed this same claim and rejected it.  The Court concludes that the state court's results neither contravened nor unreasonably applied clearly established federal law. 28 U.S.C. § 2254(d).   Nor did the state court's rulings result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Id.

379.     For all of the above-stated reasons, the Court recommends that Henning's remaining federal habeas claims (those that were deemed exhausted) be denied and dismissed, with prejudice.

**Recommended Disposition**

380.    That Linda Henning's § 2254 petition [Doc. 1] and all related pleadings be DENIED and that this matter be DISMISSED, with prejudice.


_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge